UNITED STATES of America, Plaintiff-Appellant,

v.

CITY OF ALEXANDRIA et al., Defendants-Appellees.

No. 78–1436.

United States Court of Appeals, Fifth Circuit.

April 10, 1980.

---

David L. Rose, Katherine P. Ransel, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Haynes L. Harkey, Jr., Charles D. Patten, III, Monroe, La., for City of Monroe.

Dan E. Melichar, Alexandria, La., for City of Pineville.

John L. Avant, Baton Rouge, La., A. Mills McCawley, Asst. Atty. Gen., Shreveport, La., for State of La. and Maxie Cox.

Hubert A. Vondestein, Kenner, La., for City of Kenner.

John Gallagher, City Atty., George C. Dixon, Shreveport, La., for City of Shreveport.

Reginald J. McIntyre, Hammond, La., for City of Hammond.

Howard Gist, City Atty., Samuel H. Craven, Alexandria, La., for City of Alexandria.

Robert C. Cudd, City Atty., Monroe, La., for City of Monroe.

Before THORNBERRY, GOLDBERG and GEE, Circuit Judges.

GOLDBERG, Circuit Judge:

This case and its companion case, *United States v. City of Miami,* 614 F.2d 1322 (5th Cir. 1980), also decided today, present difficult and troubling questions concerning the interrelationship of "reverse discrimination," affirmative action, and the principles governing consent decrees. Most of the substance of our opinion is contained in *City of Miami,* and we do not repeat it here. Rather, we refer to and adopt the relevant portions of our *City of Miami* opinion. This case does present a few wrinkles of its own, which require separate discussion and are addressed fully herein.

## I. Factual Background

In November, 1976, an Assistant Attorney General in the Civil Rights Division of the Department of Justice wrote a letter to the Attorney General of the State of Louisiana, informing him of the results of an investigation by the Department of Justice into the employment practices of municipal and parish fire and police departments in the State of Louisiana. That letter spelled out in detail the racial and sexual composition of the labor force of the municipalities and parishes involved in the study. It stated, *inter alia*, that the municipalities and parishes involved had a total population which was approximately 27% black and approximately 52% female; that, in the police departments involved, approximately 8% of the employees were black and 12% were female; and that, in the fire departments involved, approximately 2% of the employees were black, and 1% female.[1] The letter further stated that the Justice Department was convinced of the existence of a pattern and practice of discriminatory employment practices in the fire and police departments involved in the study, and invited settlement discussions.

On June 29, 1977, a complaint was filed in the United States District Court for the Eastern District of Louisiana by the United States of America against a class consisting of numerous Louisiana municipalities and several of their officials, alleging that the defendants "have traditionally pursued and continued to pursue policies and practices which discriminate against blacks and females and which deprive or tend to deprive them of employment opportunities or adversely affect their status as employees because of race or sex," in violation of Title VIII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17.

Along with the complaint, a partial consent decree[2] was filed, already signed by representatives of the United States government and the municipal defendants.[3] It spelled out in great detail a plan to insure that blacks and women would not be unlawfully discriminated against in the future, and to remedy any disadvantage of blacks and women which may have resulted from past unlawful discrimination. It also stated that it did not constitute an adjudication on the merits and that the defendants denied that any unlawful discrimination had occurred.

After ordering briefing by the Justice Department, the district court filed a Memorandum Opinion on July 22, 1977. It stated that the court was not assured that the terms of the decree were not unlawful, unreasonable, or inequitable, in that it required the defendants to discriminate against qualified whites and males despite the absence of any proof, admission, or judicial finding of past discriminatory conduct. The court, stating that it was following the principles enunciated in *United States v. City of Jackson*, 519 F.2d 1147 (5th Cir. 1975) and *United States v. Allegheny-Ludlum Industries*, 517 F.2d 826 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976), refused to sign the consent decree.[4]

■ We thus face this case in a highly unusual posture: since both the plaintiff and the defendants have agreed to the relief and no other parties have entered the action, no one raises any arguments in sup-

---

1. Besides these overall statistics, the letter contained specific figures relating to the workforces of police and fire departments of individual defendant municipalities and parishes.

2. Issues concerning individual relief and some promotional practices of defendants remained, which were to be resolved by litigation.

3. The full text of the consent decree is set out as an Appendix to this opinion.

4. A succinct statement of the principles is provided by *City of Jackson*:

 Although the court must approve a consent decree, in so doing it does not inquire into the precise legal rights of the respective parties, but only assures itself that there has been valid consent by the concerned parties and that the terms of the decree are not unlawful, unreasonable, or inequitable. (citations omitted)

 *Id.*, 519 F.2d at 1151.

port of the district court's refusal to sign the proposed decree.[5]

## II. Standards for Approval of Consent Decrees

■ As we discuss in *City of Miami, supra,* at pp. 1330–1331 & 1334–1335, the typical formulation of the standards for approving consent decrees settling litigation can be stated as follows: the trial court must satisfy itself that the consent decree is not unlawful, unreasonable, or inequitable before it can be approved;[6] the appellate court will reverse only if it finds that the trial court has abused its discretion.

As we explain in *City of Miami, supra,* we can find little content in the "abuse of discretion" standard, and believe that the degree of appellate scrutiny must depend on a variety of factors, such as the familiarity of the trial court with the lawsuit, the stage of the proceeding at which the settle-ment is approved, and the types of issues involved. At the trial level, the general terms "inequitable" and "unreasonable" do not adequately take into account the various factors other than the terms of the decree itself which must enter the trial court's deliberations.

It can be said without fear of contradiction that, in practice, district courts have generally approved proposed settlements, and appellate courts have only rarely reversed decisions approving settlements. Here, we are faced with the converse of the usual situation. The court below refused to approve the consent decree presented for his approval. We have found only one court of appeals which has applied the abuse of discretion standard to review of a trial court's refusal to approve a settlement. *See In re International House of Pancakes Franchise Litigation,* 487 F.2d 303, 304 (8th Cir. 1973).[7] This extension by the Eighth

---

5. In *Carson v. American Brands, Inc.,* 606 F.2d 420 (4th Cir. 1979) (*en banc*), the Fourth Circuit held that a district court's refusal to enter a consent decree agreed to by the litigants in a Title VII class action between private parties is not appealable. Fifth Circuit precedent compels us to reach the opposite result here. In *Myers v. Gilman Paper Corp.,* 544 F.2d 837 (5th Cir.), *cert. dismissed sub nom. Local 741, International Brotherhood of Electrical Workers v. Myers,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), we held that an order approving a settlement *containing injunctive provisions* relating to recruitment and hiring was one " 'granting,' 'continuing,' or 'refusing to dissolve' an injunction," and was therefore appealable under 28 U.S.C. § 1292(a)(1), *id.* at 847, relying on our earlier decisions of *Sagers v. Yellow Freight System, Inc.,* 529 F.2d 721, 730 (5th Cir. 1976), and *United States v. T.I.M.E.—D.C., Inc.,* 517 F.2d 299, 307 n.11 (5th Cir. 1975), *vacated and remanded on other grounds sub nom. International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Since an order granting approval of a consent decree is one "granting" an injunction for purposes of § 1292(a)(1), an order refusing approval of a consent decree is necessarily one "refusing" an injunction for purposes of § 1292(a), and is therefore appealable.

We also note that the Fourth Circuit relied heavily on cases such as *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), *Gardner v. Westinghouse Broadcasting Co.,* 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978), and *Seigal v. Merrick,* 590 F.2d 35 (2d Cir. 1978), all of which relate to class actions or shareholder derivative suits, in resolving the question of appealability of orders denying approval of settlements in the class action context. We are not here faced with the special concerns relating to class actions *addressed by those cases, and need not decide* whether we would follow *Carson* if faced with a district court's refusal to approve a proposed class action settlement.

6. This is the formulation stated in *United States v. City of Jackson,* 519 F.2d 1147, 1151 (5th Cir. 1975). More positively, it has been said that the trial court must find the settlement fair, adequate, and reasonable. *See Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977). We do not adopt this precise standard because of special considerations we consider relevant here. *See City of Miami, supra,* at pp. 1331–1334.

7. In *International House of Pancakes,* the district court refused to approve a settlement which was opposed by members of the plaintiff class on the ground that it would perpetuate the very illegalities challenged by the lawsuit, and was affirmed by the court of appeals. As far as we can determine, no court of appeals has ever upheld a district court's refusal to enter a consent decree when no one other than the trial judge himself has raised any objections to it. *But cf. Carson v. American Brands, Inc.,* 606 F.2d 420 (4th Cir. 1979) (order refusing to enter consent decree is not appealable).

Circuit to disapprovals of settlements was done in summary fashion, and without analysis. We decline to follow its lead.[8] The public policy in favor of voluntary settlements,[9] which is fostered by a deferential standard of appellate review, is defeated by a standard which would allow trial courts to impose their views of reasonableness, subject only to highly deferential "abuse of discretion" review, on settlements reached by the government agencies responsible for the enforcement of Title VII rights.

In the procedural context of this case, the desirability of careful review at the appellate level is manifest. The trial court had heard no evidence at the time the consent decree was presented for his approval. There is thus no reason to defer to the trial court's greater exposure to and familiarity with the litigants, their strategies, positions and proofs, unlike the typical situation in which settlement negotiations come to fruition later in the pretrial process, represented by *Ace Heating & Plumbing Co., Inc. v. Crane*, 453 F.2d 30, 34 (3d Cir. 1971).

We do not carry the mistaken notion that heightened review of district court refusals to enter consent decrees will resolve the almost intractable problems in this area. But we do not believe that individual federal judges should have almost unchallengeable power to slow or halt the progress of well-intentioned efforts to eradicate the effects of past discrimination and prevent future discrimination. The extent and velocity of affirmative action is among the most difficult problems facing the judiciary today. Even the Supreme Court has been unable or unwilling to lay down any guidelines concerning the speed with which voluntary affirmative action may proceed. District courts should not have unchallengeable unilateral power to slow its pace.

For these reasons, we will undertake a *de novo* review of the consent decree which was proposed by the parties.[10] This review must be governed by the principles which we today have decided govern the consideration of consent decrees in this context: that a consent decree proposed by a private defendant and government agency in an employment discrimination case carries with it a presumption of validity that is overcome only if the decree contains provisions which are unreasonable, illegal, unconstitutional, or against public policy. *See City of Miami, supra*, at pp. 1333–1334.

## III. *Application of the Standard*

Our review of the proposed consent decree reveals no provisions that could be called unreasonable, illegal, unconstitutional or against public policy. To the contrary, the goals established by the decree coincide exactly with those of Title VII—to ensure equality of employment opportunities for groups who have been excluded from full participation in the labor market. The proposed decree established long term goals of achieving in all job classifications the same percentages of blacks and women as are present in the workforces in the various affected localities. In the interim, goals ranging from 15% to 50% blacks or women were set for the filling of vacancies within the departments. We cannot say that these goals are oppressive to whites or males, or are against public policy; nor does anything appear which would make us believe that they are illegal or unconstitutional.

### A. *Legality, Constitutionality, and Public Policy.*

Since no one has appeared, either before the trial court or on appeal, to urge that the provisions of the consent decree are illegal, unconstitutional, or against public policy,

---

**8.** We note a suggestion in Judge Thornberry's opinion in *City of Jackson, supra*, that consent decrees which fully satisfy all parties will not come before us for consideration. *Id.*, 519 F.2d at 1150. This statement seems to presume almost automatic approval of settlements to which all parties agree.

**9.** *See City of Miami, supra*, 614 F.2d at 1331.

**10.** Despite the presumption of validity which we hold attaches to consent decrees in this context, *see City of Miami*, 614 F.2d at 1333, the courts cannot shirk their duty to consider proposed decrees carefully. Especially since the trial court refused to sign the decree, we must undertake the analysis required by the principles laid down today.

we cannot be sure that no such argument can be made. However, the only provisions of the consent decree which seem possibly subject to attack are those which impose hiring and promotional goals. It is these provisions which appear to have been the focus of the trial judge's concern when he refused to sign the decree. The trial judge relied on his own opinion in *Weber v. Kaiser Aluminum and Chemical Corp.*, 415 F.Supp. 761 (E.D.La.1976), *aff'd*, 563 F.2d 216 (5th Cir. 1977), *rev'd*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), as well as on the opinions of the Second Circuit in *Kirkland v. New York State Department of Correctional Services*, 520 F.2d 420 (2d Cir. 1975), *cert. denied*, 429 U.S. 974, 97 S.Ct. 480, 50 L.Ed.2d 582 (1976), and *Equal Employment Opportunity Commission v. Local 638*, 532 F.2d 821 (2d Cir. 1976), in finding percentage goals unacceptable. His reliance is misplaced. *Weber* has since been reversed by the Supreme Court. *Kirkland* and *Local 638*, which, of course, are not binding on this court except to the extent we find their reasoning persuasive, recognize that "minority membership goals have

been condoned on specific occasions as 'appropriate' exercises of equitable powers." *Local 638, supra*, 532 F.2d at 827. Our own decisions have often refused to upset relief involving goals and timetables, including some in the context of consent decrees between employers and the United States. *See United States v. City of Jackson*, 519 F.2d 1147 (5th Cir. 1975); *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).[11]

In *City of Miami* we undertake a detailed analysis of the status of racial and sexual goals to meet affirmative action objectives. See pp. 1335–1338 of *City of Miami*. We need not repeat that analysis here; it applies verbatim and we incorporate it by reference. It suffices to state our conclusion: at least in the context of suits brought by the federal government against municipalities alleging violations of Title VII, goals and targets are acceptable under the Constitution and laws of the United States so long as they are reasonably related to the legitimate state goal of achieving equality of employment opportunity.[12]

11. Also, in *E.E.O.C. v. American Telephone & Telegraph Co.*, 556 F.2d 167 (3d Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978), the Third Circuit upheld, over the strenuous challenge of unions who had intervened in the suit, a consent decree requiring racial, sexual and ethnic targets equal to the respective percentages in the local labor forces.

12. We note here that the concern over discrimination by public sector employers, *see City of Miami, supra*, at p. 1338 n. 29, has been particularly focused on municipal police and fire departments. A 1969 study by the United States Commission on Civil Rights reached the following conclusions:

> Barriers to equal employment are greater in police and fire departments than in any other area of state and local government . . . Negroes are not employed in significant numbers in police and fire departments . . . Negro policemen and firemen hold almost no positions in the officer ranks . . . Police and fire departments have discouraged minority persons from joining their ranks by failure to recruit effectively and by permitting unequal treatment on the job including unequal promotional opportunities, discriminatory job assignments, and harassment by fellow workers. Minority group hostility to police and fire departments also deters re-

cruitment, and this has not been overcome by the departments.

U. S. Commission on Civil Rights, "For all the people . . . By all the people," 119–120 (1969).

The House Report on the 1972 amendments to Title VII, H.Rep.No. 92–238, *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2137, 2153 noted specifically the acuteness of the problem of discrimination in law enforcement because of the visibility of this activity to the minority community.

Numerous police and fire departments have been found to have engaged in unlawful discrimination. *See, e. g., Detroit Police Officers' Association v. Young*, 608 F.2d 671 at 686 (6th Cir. 1979); *Dawson v. Pastrick*, 600 F.2d 70 (7th Cir. 1979) (East Chicago, Indiana Fire Department); *Firefighters Institute v. City of St. Louis, Mo.*, 588 F.2d 235 (8th Cir. 1978), *cert. denied*, 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979); *Davis v. County of Los Angeles*, 566 F.2d 1334 (9th Cir. 1977) *vacated and remanded as moot*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *Boston Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975) (Boston Fire Department); *NAACP v. Allen*, 493 F.2d 614 (5th Cir. 1974) (Alabama Highway Patrol); *Morrow v.*

Therefore, we turn immediately to the question of the reasonableness of the consent decree at issue here.

## B. *Reasonableness.*

Since the consent decree was submitted for approval at the same time the complaint was filed, the reasonableness and appropriateness of the consent decree must be measured against the allegations of the complaint and the relief which might have been granted if the case had gone to trial. *See Cotton, supra,* 559 F.2d at 1330. For this purpose, we must briefly review some principles of Title VII litigation.

■ To make out a prima facie case of pattern or practice of discrimination in violation of Title VII, all that a private or government plaintiff need show initially is that there is a significant statistical disparity between the racial, sexual or ethnic balance and composition of an employer's work force and that of the community from which the workers are hired. *See, e. g., Hazelwood School District v. United States,* 433 U.S. 299, 306, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 225 n. 34 (5th Cir. 1974). This is true because, "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employ-

ees are hired." *Teamsters, supra,* 97 S.Ct. at 1856 n. 20.

■ Once this prima facie case has been established, the employer may introduce evidence to attempt to rebut the inference raised by the figures. *See, e. g., Hazelwood, supra; Dothard, supra; Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). If the employer is unable to rebut the prima facie case, the district court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280.

We have never heard of any doctrine of law which requires a defendant to put on a defense to rebut a prima facie case. In *Hazelwood, supra,* for example, the defendant offered virtually no evidence in response to the government's case. 97 S.Ct. at 2739. In *Teamsters, supra,* the defendant's case consisted mainly of general statements that it hired only the best qualified applicants. 97 S.Ct. at 1858 n. 24. The defendant may simply claim that the plaintiff's case is insufficient, and choose to present no evidence. If this had occurred in the instant case, or if the evidence presented by the defendants had been insufficient to rebut the government's prima facie case,[13] the trial court would have been obligated to enter a decree against the defendants.

Although the proposed consent decree contains a disclaimer of any admission of discrimination, we do not understand the

*Crisler,* 491 F.2d 1053 (5th Cir.) (en banc), *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) (Mississippi Highway Patrol); *Vulcan Society of N.Y. City Fire Dept., Inc. v. Civil Service Commission,* 490 F.2d 387 (2d Cir. 1973); *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission,* 482 F.2d 1333 (2d Cir. 1973) (Bridgeport, Connecticut Police Department); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971) (en banc) (Minneapolis Fire Department); *Commonwealth of Pennsylvania v. Flaherty,* 404 F.Supp. 1022 (W.D.Pa.1975) (Pittsburgh Police Department); *Western Addition Community Organization v. Alioto,* 369

F.Supp. 77 (N.D.Cal.1973), *appeal dismissed as moot,* 514 F.2d 542 (9th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975) (San Francisco Fire Department).

13. We note that a defendant's inability to rebut a prima facie case of employment discrimination does not necessarily mean that the defendant has discriminated. Once the burden of validating its practice has shifted to the employer, it may lose its case because it is unable to meet its burden of persuasion, or merely because its attorneys have done a less thorough job than was possible.

defendants seriously to dispute the facts concerning the statistical composition of their workforces and the communities from which they are drawn contained in the government's complaint and in the letters written by government attorneys to various state and local officials. Applying the teachings of *Teamsters, supra*, these statistics would raise an inference of discrimination sufficient to shift the burden of justification to the defendants.[14] As we have noted, the defendants have no obligation to contest the inference of discrimination raised by these statistics, and they do not contest it here.[15]

Looking at the provisions of the consent decree as if the plaintiff had put on a case consisting solely of the uncontroverted statistics in the complaint and other documents before it, and the defendants had rested without putting on any rebuttal evidence, we find nothing inappropriate about the consent decree.[16]

It is very difficult to review the appropriateness of a decree *in vacuo*. Our normal role is to respond to arguments made by parties to the litigation. However, it is clear here that the major provisions of the decree which are controversial are those which establish goals for the employment of blacks and females in the police and fire department of the defendant municipalities, so we will focus our attention on these goals.

Without race and sex-consciousness, the effects of past racial and sexual discrimination cannot be eradicated. Many cases have held racial and sexual goals to be appropriate.[17] The consent decree in *City of Jackson, supra*, set hiring goals at 50% black and 33⅓% female. *Id.*, 519 F.2d at 1150 n. 4. *Morrow v. Crisler*, 491 F.2d 1053 (5th Cir.) (en banc), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974), authorized temporary one-to-one black/white hiring ratios. *Carter v. Gallagher*, 452 F.2d 315

---

14. The letter dated November 15, 1976, from J. Stanley Pottinger then an Assistant Attorney General in the Civil Rights Division of the Department of Justice, to the then Attorney General of Louisiana, William J. Guste, Jr., which was submitted to the district court along with the proposed consent decree, contains numerous telling statistics. The magnitude of the overall disparity between the racial and sexual composition of the Labor force in the defendant municipalities and that of their police and fire department workforces is amply indicated by the following excerpt:

> According to 1970 Census data, the 39 municipalities and 9 parish fire protection districts involved in our investigation have an approximate total population of 1,411,569 persons of which 27.3% is black and 51.8% is female, with females comprising 37% of the labor force.
>
> As of June 30, 1974, there were approximately 2,903 police department employees in the 39 covered municipalities, of whom approximately 8.2% were black and 11.6% were female. Of approximately 1,741 Protective Service police employees, 8.5% were black and 2.6% were female.
>
> As of June 30, 1974, there were approximately 2,243 fire department employees in the 45 covered municipal and parish fire departments, of whom approximately 2.1% were black and 1.1% were female. Of approximately, 1,114 Protective Service Fire employees, 3% were black and 0% were female.

15. We interpret the disclaimer of any discrimination in the proposed consent decree to be, in effect, a reservation of the right to contest the allegation of illegal discrimination in any suit for additional relief, either by the government or by a private plaintiff. Such a disclaimer is standard in many consent decrees in this context, *see, e. g., E.E.O.C. v. Contour Chair Lounge Co.*, 596 F.2d 809 (8th Cir. 1979), and is insisted upon by many defendants for the obvious reason that they do not wish unnecessarily to open themselves up to large backpay awards. In the context of consent decrees providing affirmative action relief, we interpret the disclaimer to be an admission that there is a statistical disparity which the defendants cannot unequivocally explain, together with a reservation of the right to attempt to explain it at any other time.

16. We do not understand the trial court to have held to the contrary; rather, we read his opinion to have held that numerical or percentage goals or quotas are *per se* illegal absent a judicial finding of past discrimination. This position is made untenable by the Supreme Court's decision in *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). See discussion in *City of Miami, supra*, at pp. 1336–1338.

17. See cases cited in *City of Miami*, 614 F.2d at 1335.

(8th Cir. 1971) (en banc), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972), authorized a one-to-two hiring ratio.

These and similar cases establish the guidelines for ratios and percentage goals. With statistical imbalances as severe as those present here, we do not feel that the percentages used in the consent decree, none of which exceeds 50% blacks or females, are inappropriate. Significantly, the goals are all temporary, and will terminate when the manifest imbalances have been eliminated.[18] Moreover, the goals do not establish an absolute bar to the advancement of white males.. *See Weber, supra*, 99 S.Ct. at 2720. Additionally, only qualified blacks and women need be considered by the defendants for vacancies. Thus, the preference only operates to prefer a black or a woman to a white male when both applicants are qualified for the job. Traditionally, white males have been preferred in this situation in the past. The goals will thus serve to prevent those responsible for personnel decisions from automatically choosing a white male when there is a qualified black or female. This attempt to break down traditional patterns which foreclose opportunities to blacks and women was the motivation behind Title VII. *See Weber, supra*, 99 S.Ct. at 2730.

#### IV. *Conclusion*

Like the defendants in *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the defendants here were on a "high tightrope without a net beneath them." *Weber, supra*, 99 S.Ct. at 2731 (opinion of Justice Blackmun) *quoting Weber*, 563 F.2d 216, 230 (5th Cir. 1977) (dissenting opinion of Judge Wisdom). Like the defendants there, the defendants here face liability for past discrimination against blacks, yet cannot attempt to rectify past wrongs without fearing liability to whites. In the face of strong crosswinds from judicial decisions about affirmative actions, defendants here had performed the difficult acrobatic task

required of them, and had nearly crossed the tightrope. They had successfully negotiated a plan that would, over time, undo the effects of past hiring decisions that had resulted in overwhelmingly white male work forces, yet would not unnecessarily trammel the interests of white male employees. The Justice Department was satisfied that the plan was fair and realistic. All that was needed was the trial court's approval.

The trial court however, zealously guarding the tower at the end of the tightrope, was not satisfied. It would not let the defendants off, he said, before they joined with the plaintiffs in performing an intricate dance on the tightrope—a dance involving detailed statistics and complicated proof for fifty-four separate defendants. We do not believe the tower guard must protect its territory so zealously. Rather, it must lend a helping hand to those who have already come this far—the court must look at the proposed plan with a sympathetic eye, and extend what aid it can.

For a successful performance on a tightrope, the rope must be sufficiently taut to support the acrobat, yet must have enough play to afford him some control. An affirmative action plan has similar constraints. The extent of an acceptable plan cannot be measured with mathematical exactitude. The plan must not strangle employees of any race or sex, but with too much play, the leeway for employment decisions based on racial or sexual prejudices becomes too large. Goals and targets, set at reasonable levels, can afford this degree of flexibility.

The Department of Justice is charged with attempting to remedy "pattern or practices" of discrimination in employment by local governments. In this case, it found clear evidence of discrimination in the statistical composition of defendants' work-forces, evidence that defendants did not

---

**18.** In a recent decision, the Sixth Circuit has said that "a goal which seeks the same racial proportion among employees as in the labor force will ordinarily be reasonable." *Detroit Police Officers' Association v. Young*, 608 F.2d 671 at 696 (6th Cir. 1979). Absent unusual circumstances or undue hardship to non-minority workers, we agree with this proposition.

contest. In compliance with the spirit of voluntary conciliation necessary to effectively end discrimination in employment, the defendants and the Justice Department negotiated a consent decree similar to many approved before, and presented it to the district court for approval. Because the proposed decree "discriminates" against white males, the district court refused to approve it.

Our analysis has revealed that the decree should have been approved. The remedial provisions contained in the decree are a reasonable effort to ensure equality of opportunity for blacks and females without unduly sacrificing the interests of white males. The Department of Justice has given its approval to the settlement. Accordingly, we reverse the district court's refusal to enter the consent decree, and remand for the district court to enter the decree and for further proceedings consistent with this opinion.

REVERSED and REMANDED.

## APPENDIX

### PARTIAL CONSENT DECREE

The plaintiff United States of America filed its complaint in this action against, *inter alia* the State of Louisiana, the State Examiner, Municipal Fire and Police Civil Service, and the Cities of Baton Rouge, Shreveport, Monroe, Alexandria and Kenner (hereinafter referred to as Employers), as representatives of a class of defendant cities and fire protection districts for whom police and personnel employment examinations are administered by the State Police and Fire Civil Service. The Complaint alleges that the defendants are engaged in a pattern or practice of discrimination in employment on the basis of race and sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, as amended, the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. 3766, as amended, and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, as amended.

The parties, being desirous of settling this action by appropriate decree, agree to the jurisdiction of this Court over the respective parties and subject matter of this action, and hereby waive the entry of findings of fact and conclusions of law. The parties further aver that this action may be properly maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and that the named defendants are proper representatives of that class. This Decree is final and binding as to the issues resolved herein. This Decree, being entered with the consent of the defendants, shall not constitute an adjudication or finding on the merits of the case and the defendants and each of them, deny that any unlawful discrimination has occurred. Defendants specifically assert that this Decree shall not constitute an admission of any violation of law.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The defendants, their officials, agents, employees and successors, and all persons in active concert or participation with them in the performance of police and fire service functions covered by the complaint filed in this action are permanently enjoined from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any black or female employee of, or any black or female applicant or potential applicant for, employment with their respective departments or districts because of such individual's race, color, or sex. Specifically the defendants shall not unlawfully discriminate against any such individual in hiring, promotion, assignment, upgrading, training, discipline or discharge because of race, color, or sex. Further, defendants shall not retaliate against or in any respect adversely affect any person because that person has lawfully opposed discriminatory policies or practices or because of that person's participation or cooperation with the initiation, investigation or litigation of any charge of discrimination based on race or sex, or the administration of this Decree.

2. It is the purpose and intent of this Decree to insure that blacks and women are not unlawfully discriminated against by the hiring, promotion, assignment and other employment policies and practices of the defendants with respect to the defendant Employers' police and fire departments, and that any disadvantage to blacks and women which may have resulted from past unlawful discrimination is remedied so that equal employment opportunity will be provided to all. The defendants have agreed (without admitting that any such standard is legally required) that in determining whether such purpose and intent has been achieved, to use as a standard of comparison the proportion of blacks and women in the appropriate work force of their respective cities and fire protection districts, and agree to undertake as the long term goal of this decree, subject to the availability of qualified applicants, achieving those proportions of blacks and women in the uniformed and non-uniformed job classifications within their respective police and fire departments as blacks and women bear to the appropriate work force in the particular jurisdiction. For purposes of this Decree uniformed refers to sworn police officers and all fire personnel performing fire fighting, prevention or inspection duties. In meeting this long term goal the defendants shall adopt the interim goals set out below, measured on an annual basis in filling vacancies within those departments:

(a) For the entry uniformed positions of police officer and firefighter, the interim goals shall be to fill at least fifty percent (50%) of all vacancies with qualified black applicants until the departmental goal of the work force percentage is met.

(b) For the uniformed entry position of police officer, the interim goal shall be to fill at least twenty-five percent (25%) of the vacancies with qualified female applicants, and for the uniformed entry position of firefighter, the interim goal shall be to fill at least fifteen (15%) of the vacancies with qualified female applicants until the departmental goal of the work force percentage is met.

(c) For non-uniformed positions within the respective departments, the interim goal for blacks shall be to fill at least fifty percent (50%) of the vacancies with qualified black applicants. For purposes of determining compliance with this subparagraph, all vacancies in non-uniformed positions shall be grouped together, expect with respect to those jurisdictions in which heretofore there have been traditionally black positions, such as janitor or laborer, in which case such traditionally black positions will not be grouped with the other positions for purposes of determining compliance.

(d) For non-uniformed positions within the respective departments, the interim goal for women shall be to fill at least fifty percent (50%) of the vacancies with qualified female applicants. For purposes of determining compliance with this subparagraph, all vacancies in non-uniformed positions shall be grouped together, except with respect to those jurisdictions in which heretofore there have been traditionally female positions such as secretary, typist, record clerk or matron, in which case such traditionally female positions will not be grouped with the other positions for purposes of determining compliance.

For purposes of determining compliance with the interim goals established in paragraph 2 of this decree, persons "blanketed in" pursuant to Louisiana state law shall be considered persons filling vacancies subject to the interim goals; further, for purposes of this decree, persons who fail to complete probation shall not be counted as having been appointed. The parties recognize that, in evaluating an Employer's compliance with the interim and long term goals for women established herein, the level of interest demonstrated by women in the work force, after good faith recruitment efforts pursuant to paragraph 14 hereof, shall be considered.

3. Applicants identified as victims of unlawful discrimination under paragraph 15(b) of this Decree shall be given initial preference in filling entry level vacancies

under this Decree. Upon employment of such persons, the filing of vacancies in entry positions shall proceed pursuant to the provisions of paragraph 2 above.

4. The interim goals for blacks and women set forth in paragraph 2 shall continue in effect for each department or district until the long term goals for that department or district have been achieved and maintained for a period of one year.

5. In filling vacancies in the uniformed entry positions (firefighter and police officer or equivalent titles), defendants may require that applicants, to be considered qualified, meet the minimum standards set forth by state law or by the respective local fire and police civil service boards as of January 1, 1977, or such other valid standards as the state or local boards may subsequently adopt, except that:

(a) In the event that a local board intends to modify any qualification or standard for hiring or promotion subsequent to January 1, 1977, the board shall, forty-five (45) days prior to the implementation of such modification, notify plaintiff in writing of the content of such intended modification.

(b) Any age limitation permitted above shall be subject to the provisions of paragraph (6) below.

(c) Minimum formal education requirements permitted above shall be deemed to include acceptance of the GED equivalent.

(d) All minimum height and weight requirements shall be abolished. This provision shall not prohibit the administration of a job-related test of physical strength and agility, provided that if an Employer wishes to utilize such a test, it shall provide to plaintiff in writing, forty-five (45) days prior to its use, a specific description of the test content.

(e) Utilization of background investigations and other factors related to applicants' character and suitability for employment shall be conducted in accordance with the provisions of paragraph 7 below.

(f) If plaintiff believes that the interim hiring goals are not being met because of standards or practices permitted herein, or otherwise objects to a standard or its implementation, the affected parties shall meet and attempt to agree on a modification thereof, or other appropriate action. Failing agreement, either party may move the Court for a determination of the lawfulness or validity of the standard or practice.

6. Any maximum age limitation permitted pursuant to paragraph 5 above shall be deemed waived for any black applicant who at a time when he was qualified because of age, failed the written examination for any eligibility list which was in effect on or subsequent to March 24, 1972; for any female applicant who at a time when she was qualified because of age was eliminated from consideration by minimum height and weight requirements subsequent to March 24, 1972 and for any black or female applicant who was at the time qualified because of age, and who passed the written examination for eligibility list in existence on or after March 24, 1972, but was not appointed from that list. Within ninety (90) days of entry of this Decree, defendants, together with the plaintiff, shall review the records of the state and local boards to determine the identity of such persons, and the defendants shall notify such persons by registered mail of their right to re-apply regardless of age for the next appropriate examination, and such notice will again be given thirty (30) days prior to the next examination. Notice by registered mail to the individual at his last known address complies with this paragraph.

7. Except as otherwise provided, in evaluating applicants, Employers shall utilize their standards and procedures in a manner non-discriminatory in purpose and effect and consistent with achieving the interim goals set forth in paragraph 2 above. Each Employer shall provide to plaintiff within forty-five (45) days of entry of this Decree a list of all disqualifying factors for employment as a uniformed police or fire employee, and a list of those factors which are not automatically disqualifying, but which are

considered in evaluating an applicant's character or suitability for employment. Plaintiff shall review these factors and if the parties disagree on the validity of these considerations, either party may move the Court for resolution. Approval or acquiescence of plaintiff in the use of factors which are not automatically disqualifying shall not be deemed to be approval of the manner in which the factor may be utilized with respect to any particular individual.

8. The State Examiner may, for the entry level positions of firefighter and police officer, administer to applicants a written examination as provided by the present Louisiana Statute for the purpose of establishing lists of qualified applicants for certification to defendant cities and fire protection districts, *Provided* that such examination shall not be a defense for failure to meet the interim hiring goals set forth in paragraph 2 hereof, unless the parties mutually agree that the examination and the passing score utilized do not have an adverse discriminatory impact or validly measure the qualifications for those positions and are required by business necessity. If defendants wish to assert the validity of the written examination as a defense for failure to meet the interim hiring goals set forth in paragraph 2 hereof, they shall provide to plaintiff any relevant validity studies and underlying data. If the parties are unable to agree on the validity of the examination, either party may move the Court for a determination of its lawfulness.

9. Where appropriate, defendants shall retitle classes, such as fireman, to eliminate the suggestion of sex preference. No additional appointments shall be made from existing eligibility lists for positions covered by this Decree, unless continued use of the list will allow compliance with the interim goals established in this Decree.

10. Current education and experience requirements established for non-uniformed positions may be continued, provided that such requirements shall not be a defense for failure to meet the interim goals established in paragraph 2(c) and (d) unless the parties mutually agree that such requirements are valid or do not have adverse impact on blacks or women. If the defendants wish to assert the validity of such requirements as a defense for failure to meet the interim hiring goals set forth in paragraph 2 hereof, they shall so notify plaintiff. If the parties are unable to agree on the validity of the requirements, either party may move the Court for a determination of their lawfulness.

11. There shall be no discrimination on the basis of race or sex with respect to duty assignments within the police and fire departments, except as may be lawfully required by the special nature of the assignment.

12. (a) The defendants, and each of them, agree to develop and implement an active and continuing program of recruitment directed at increasing substantially the number of black and female applicants for police and fire positions to a level consistent with their obligation to achieve the interim hiring goals established in paragraph 2 above.

(b) Before establishing an eligibility list for the entry positions in police and fire departments covered by this Decree, each local board shall determine and report to the State Examiner whether, based on estimated hiring during the life of that list and the race and sex make up of that list, the department will be able to meet its interim hiring goals from that list. Should compliance not be reasonably expected given the make up of that list, the Local Board shall not certify for employment from that list and the appointing authority and the State Examiner shall immediately notify the plaintiff in writing of the matter, specifying all relevant details, including a copy of the list, identified by race and sex, and the number of anticipated appointments over the life of that list. The affected parties shall then meet within a reasonable period to discuss methods by which the department can meet its goals from that list or any subsequent list. If the parties fail to resolve the matter voluntarily within thirty (30) days of original notification to plaintiff, either party may move the Court for immediate resolution.

13. The Office of State Examiner, local fire and police civil service boards, and, where applicable, the local police and fire departments, shall retain all records for a period of five (5) years relating to the recruitment, selection, appointment, promotion, training, assignment and discipline of persons on police and fire departments covered by this Decree, including applications, identified by race and sex, all medical and background investigation files, training evaluations, all evaluations of applicants and employees, eligibility and certification lists with persons identified by race and sex, and records relating to discipline and discharge. Plaintiff shall have the right to inspect and copy any or all such documents upon reasonable notice to defendants without further order of this Court, except that proper authorization from the individual or an order of the Court may be required with respect to medical records. In addition, defendants shall furnish such information or records as plaintiff requests in writing, provided such requests shall not be unduly burdensome and provided further that plaintiff shall pay the reasonable costs thereof.

14. For purposes of this Decree, a reporting period shall run from July 1 through December 31 and from January 1 through June 30 for each year. Within thirty (30) days after the close of each reporting period:

(a) The State Office of Fire and Police Civil Service shall provide to plaintiff:

1. For each department covered by this Decree, the number of persons, by race and sex, tested for each position in the department, and the number, by race and sex, who passed the examination during the reporting period.

2. Copies of each eligibility list established for a position during the reporting period, with persons identified by race and sex.

3. A summary efforts made by the State during the reporting period in connection with recruitment of blacks and women, pursuant to paragraph 12(a), of this Decree.

(b) Each local fire and police civil service board shall provide to plaintiff for each police and fire department covered under this Decree:

1. The number of persons, by race and sex, appointed to each position on these police and fire departments during the reporting period.

2. The number of persons, by race and sex, disqualified during the reporting period for appointment to a position on these departments, categorized by position, and reasons for disqualification.

3. The name, address, telephone number, race and sex of each person terminated or who resigned from these departments during the reporting period, prior to completion of probation.

4. The name, address, telephone number, race and sex of each black or female employee discharged during the reporting period, and a statement of the reasons for discharge.

5. The total number of persons in each job classification in these departments, by race and sex, as of the close of the reporting period.

6. An estimate of the number of appointments anticipated by the department in each job classification during the next reporting period.

7. A summary of all efforts made by the departments during the reporting period in connection with the recruitment of blacks and women, pursuant to paragraph 12(a) of the Decree.

(c) Each local fire and police civil service board shall also provide to plaintiff, within forty-five (45) days of the entry of this Decree, a report showing the number of persons, by race and sex, in each job classification of each police and fire department covered by this Decree, as of January 1, 1977.

15. (a) The parties reserve for resolution all issues raised by the Complaint with respect to standards, policies or practices related to the promotion of personnel, and to all claims asserted by the plaintiff on behalf of persons alleged by plaintiff to

have been disadvantaged by virtue of unlawfully discriminatory policies or practices of defendants.

(b) Upon entry of this Decree, plaintiffs shall be given all reasonable access, for purposes of inspection and copying, in accordance with the provisions of paragraph 13 relating to medical records and payment, to the personnel records of the defendants relating to police and fire employment, including both hire and promotion, for the purpose of identifying blacks and women who may have been victims of unlawful race or sex discrimination. Such review shall be completed as soon as possible, but in any event within one year of entry of this Decree.

16. Nothing in this Consent Decree prejudices the rights of defendants to, at any time appropriate, urge that adverse impact alone, unaccompanied by discriminatory intent, does not constitute a violation of the law or to urge that the Congress is without power to dispense legislatively with the requirement that discriminatory intent be established.

17. For those named defendants and class members who sign or stipulate to the terms of this Decree, the operation of Section 518(c)(2)(E) of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, shall be stayed.

18. The Court shall retain jurisdiction of this action for such further relief as may be necessary or appropriate to effectuate the purposes of this Decree. At any time after five years from the date of this Decree defendants or any of them may apply with sixty (60) days notice to plaintiff, for termination of this Decree with respect to that party, and upon a showing by that defendant of achievement of the goals of this Decree, such motion shall be granted by the Court, absent good cause shown by plaintiff.

GEE, Circuit Judge, specially concurring:

By contrast to *United States v. City of Miami, et al.,* 614 F.2d 1322 (5th Cir. 1980), the companion case handed down today, no party to this appeal resists the proposed consent decree on any ground, constitutional or otherwise. In the absence of a constitutional challenge, I believe that the propriety of the proposed decree is sustained in principle by the Supreme Court's decision in *Weber v. Kaiser Aluminum & Chemical Corp.,* 415 F.Supp. 761 (E.D.La. 1976), *aff'd,* 563 F.2d 216 (5th Cir. 1977), *rev'd sub nom. United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). I therefore concur in the result only.