Yvonne Marie BOYD, et al., Plaintiffs,

United States of America,
Plaintiff-Intervenor,

v.

POINTE COUPEE PARISH SCHOOL
BOARD, et al., Defendants.

Civ. A. No. 3164.

United States District Court,
M. D. Louisiana.

March 16, 1982.

**556**

Edselle K. Cunningham, Nelson Taylor, Baton Rouge, La., for plaintiffs.

Theodore M. Shaw, U. S. Dept. of Justice, Washington, D. C., James S. Lemelle, Asst. U.S. Atty., Baton Rouge, La., for plaintiff-intervenor U.S.A.

John F. Ward, Jr., Baton Rouge, La., for defendants.

JOHN V. PARKER, Chief Judge.

This action, which has for its objective, the desegregation of the public schools of the Parish of Pointe Coupee, Louisiana, was initiated on March 12, 1965. The United States intervened on June 14, 1966 and has been an active participant since that time, according to the record. The record of this case indicates that the matter has been before this court on three prior occasions and before the Court of Appeals for the Fifth Circuit an equal number of times. In 1974, the action was remanded, 505 F.2d 632 (5th Cir. 1974) for further proceedings in this court. After remand, discussions were had between representatives of the United States and the defendant, School Board, but no plan for further desegregation was advanced. On February 14, 1980, the United States filed a motion for supplemental relief.

On February 29, 1980, the court established a pretrial schedule looking toward completion of discovery and trial of the government's motion. Subsequently, serious settlement negotiations were entered between the United States and the School Board, as a result of which the Board agreed to and did pair two additional schools for the 1980–81 school year. Ultimately the School Board and the United States have reached agreement upon a proposed consent decree for complete desegregation of this school system.

This negotiation process has consumed a significant amount of time and has involved representatives of (original) plaintiffs, as well as the United States and the School Board.

The proposed consent decree was filed with the court and on October 8, 1981, the court ordered all parties who desired to oppose the proposed consent decree to file formal opposition no later than November 20, 1981, and further that they submit proposed alternatives no later than December 18, 1981. A hearing was fixed for January 19, 1982 for consideration of the proposed consent decree and all objections, alternatives and modifications.

Neither (original) plaintiffs nor plaintiffs-intervenors, Douglas and Harris, complied with that order, in that no opposition was filed by either. At the hearing on January 19, 1982, however (original) plaintiffs presented written objections to the proposed consent decree and the court permitted those objections to be filed; they also presented proposed alternatives. Plaintiffs-intervenors have made no appearance.

At the hearing on January 19, 1982, the court received expert testimony explaining the desegregation plan embodied in the proposed consent decree and testimony of the Superintendent of schools.

Since two of the parties have agreed to all provisions of the proposed consent decree and the third agrees to some provisions but objects to others, we have here the hybrid situation described in the non-majority decision in *United States v. City of Miami*, 614 F.2d 1322, 1332 (5th Cir. 1980); rehearing granted en banc, 625 F.2d 1310 (5th Cir. 1980); opinion on rehearing 664 F.2d 435 at 440 (5th Cir. 1981). Despite the fact that there was no majority opinion in that case, it is apparent that none of the members of the court advocated abandonment of the current law of the Fifth Circuit that a district court is required to approve a consent decree which the parties have agreed upon, unless it contains provisions which are unreasonable, illegal, unconstitu-

tional or against public policy, *United States v. City of Alexandria*, 614 F.2d 1358 (5th Cir. 1980), nor of the abiding principle that the law favors compromise, even in civil rights cases. *United States v. City of Jackson*, 519 F.2d 1147 at 1151 (5th Cir. 1975). As we count the concurring and dissenting opinions in *United States v. City of Miami, supra*, that case is firm authority for the proposition that the district court must also approve, subject to the same caveat regarding reasonableness and constitutionality, those portions of a consent decree which all parties have agreed upon. 664 F.2d at 440.

Although *United States v. City of Jackson, supra, United States v. City of Alexandria, supra*, and *United States v. City of Miami, supra*, all involve claims of racial discrimination in employment brought under specific .provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as well as the Fourteenth Amendment and 42 U.S.C. §§ 1981 and 1983, there is no reason why the teachings of those cases should be limited to actions of that precise nature. This action is brought under the Fourteenth Amendment and alleges racial discrimination in the public schools. This court has previously applied the reasoning of those cases to a proposed consent decree in a suit alleging racial discrimination by way of dilution of voting strength. See, *United States v. East Baton Rouge Parish School Board*, Fed.Supp., M.D.La.1980, and the same principles apply here.

■ Accordingly, the court must approve those portions of the proposed consent decree as to which there is complete agreement,[1] unless there are provisions which are unreasonable, illegal, unconstitutional or against public policy.

The court has no hesitation in approving those provisions of the consent decree as to which there is complete agreement, since they involve the utilization of tools of desegregation which have been repeatedly approved by the courts, such as pairing of schools and redrawing attendance zones. All parties concur in staff and faculty reassignment in accordance with *Singleton v. Jackson Municipal Separate School District*, 335 F.2d 865, 870 (5th Cir., 1966) and the other standard provisions of desegregation plans. The objections relate to the details involving some of the specific schools. This court finds those provisions of the consent decree as to which there is full concurrence to be quite reasonable and clearly within constitutional parameters. Accordingly, all those provisions will be approved.

It is important, at this point, to note the precise procedural posture of the case. The government has filed a motion for supplemental relief and the government and the School Board have together submitted a consent decree. The School Board, as is customary for the defendant in such cases, maintains that it is already operating a unitary school system but agrees to undertake further desegregation steps as outlined in the consent decree and the consent decree does not require a confession by the Board that the system as it presently exists is unconstitutional.

The government, of course, contends that the system does not presently meet constitutional requisites but is willing to accept the School Board's agreement to take the actions outlined in the consent decree so as to avoid further litigation. The (original) plaintiffs also insist that further desegregation efforts are required and that this system is not unitary. There has been no judicial determination of that issue.

1. Although the proposed consent decree has not actually been executed by any party, the attorneys for the United States and the School Board have stipulated that this is a joint proposal and that these parties are in complete agreement. The Superintendent of Pointe Coupee Schools has also testified that the School Board has adopted the proposal. Plaintiffs have in their pleadings and in brief (which will be made a part of the record) specified those portions of the plan in which they concur and those portions which they oppose. This certainly constitutes sufficient evidence of a settlement agreement upon which the court may base its approval and enforcement of those portions which have complete concurrence of all the parties. *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207 (5th Cir. 1981).

The Pointe Coupee Parish School system is unusual in that it is majority black. The school population is about sixty-three percent black and thirty-seven percent white, 2,654 black students and 1,529 white students, as of April, 1981. The school population has been steadily declining during the last ten or twelve years. There are only ten schools in the entire system.

Pointe Coupee is an agricultural parish with no large population centers. The great Atchafalaya swamp runs through the parish and there are large areas that are unpopulated. The population tends to group itself into five more or less separate residential areas of the parish and the schools are located in those five areas.

Geographically Pointe Coupee Parish resembles a misshapen boot. The northwestern portion of the parish forms the top or leg portion of the boot and is known locally as "Upper Pointe Coupee." That area contains the unincorporated communities of Batchelor, Innis and Lettsworth, all located along Louisiana State Highway 1 which meanders through the parish and is one of only two significant traffic arteries. Upper Pointe Coupee is physically separated from the remainder of the parish by the Morganza Floodway which bisects it at about the ankle of the boot in roughly a northeast-southwest direction. Upper Pointe Coupee contains two schools, one formerly a white school and one formerly all black. Beginning in the 1980–81 school year, the School Board paired these two schools, Upper Pointe Coupee Elementary (K–6 and Special Education, formerly Innis) and Upper Pointe Coupee High School (7–12, formerly Batchelor). This has resulted in a student enrollment at the high school of about 85% black and at the elementary school at about 76% black. Plaintiffs have no complaint regarding the pairing of these two schools.

The only U.S. highway in the parish (U.S. 190) runs through the southerly part of the parish where there are also two schools. The School Board has also paired Livonia (7–12), 29% black, and Valverda (K–6), 28% black. Plaintiffs have no complaint regarding the pairing of these schools.

The easternmost portion of the parish, the "toe of the boot," contains horseshoe-shaped False River, formerly a part of the Mississippi River and now a lake. The area east of False River, between the lake and the present bed of the Mississippi, is known as "The Island of False River" and contains two schools which have also been paired. Those schools are Lakeland Elementary (K–3), 40% black, and Rougon High School (4–12), 49% black. Plaintiffs do not object to the status of Lakeland Elementary but they do object to the status of Rougon High. They advocate converting Rougon into grades four through eight and sending students in grades nine through twelve to Rosenwald High School in New Roads. New Roads is on the opposite side of False River and at the opposite end of the horseshoe.

The village of Morganza is located in the central area of the parish, southeast of the Floodway and at the top of the instep of the boot. Morganza High School (K–12) is presently 65% black and the consent decree proposes to leave that school as it is. Plaintiffs object to this proposal and they advocate closing Morganza High School, sending the students in grades K–6 to LaBarre Elementary and splitting students in grades seven through twelve between Rosenwald High and Livonia High.

The remaining area of the parish is north of False River and westerly and southerly along the Mississippi which would be the top of the foot in the boot. This area includes the town of New Roads (population about 4,000) and has three schools, LaBarre Elementary (K–8), which is 98% black, Rosenwald High School (K–12), which is 100% black, and Poydras High School (K–12), which is 28% black. The consent decree proposes to close LaBarre as a regular school and to convert it into a magnet school for the academically gifted in pre-high school grades, to install a magnet program for the academically gifted at all black Rosenwald High School (by far the largest school in the parish) and to redraw the Poydras High attendance zone so as to reassign a sufficient number of black students from Rosenwald High to enable the

student population of Poydras to approximate the district wide the racial ratio.

Plaintiffs object to this portion of the proposed consent decree and they advocate that Rosenwald and Poydras be paired, with Rosenwald becoming the high school and Poydras the elementary school.

Attached as Appendix I is a copy of Appendix I of the proposed consent decree which lists the April 1, 1981 enrollment of all schools by race. Attached as Appendix II is a copy of the student assignment proposal submitted by plaintiffs regarding Poydras, LaBarre, Rosenwald, Rougon and Lakeland schools.

■ The consent decree affects the class which (original) plaintiffs represent because that class consists of black students who will be attending the public schools of Pointe Coupee Parish. Since plaintiffs are affected third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed. *United States v. City of Miami*, 664 F.2d 435, at 441 (5th Cir. 1981).

As previously noted, the school population of Pointe Coupee Parish is more than 65% black so that it is obvious that majority black schools will predominate. The consent decree proposes to desegregate Rosenwald High School by means of the introduction of the magnet concept and it also proposes to desegregate Poydras High School by redrawing attendance zones to compel a school population approximately equal to the racial make-up of the entire system. The original plaintiffs object to the magnet concept because they are not convinced that its use will desegregate Rosenwald School. Their own proposal, if adopted, would result in the following school populations: at Poydras, 78% black; LaBarre, 75% black; and Rosenwald, 75% black.

The government, in its brief, summarizes the advantages of the proposed consent decree as follows:

"1) It allows Morganza, which when considered in the context of the district-wide student racial composition is a desegregated school, to remain as is.

2) In placing the students presently enrolled at LaBarre in the Poydras school the smallest number of students are moved into a school which has the capacity to absorb them and which, after the pairing, yields a desegregated student body.

3) The plan allows Rosenwald annex, an outdated facility, to be taken out of service.

4) The plan provides for zone lines between Poydras and Rosenwald to be redrawn to place some of the students in the Rosenwald school in the Poydras school. The result is that with the influx of LaBarre and Rosenwald students the Poydras school can be desegregated within the context of the racial composition of the school district.

5) The plan provides that a district-wide magnet program on the elementary level be housed in the LaBarre School and that students in this program would be tracked into Rosenwald, where a magnet component would be substituted. Because the number of students in Rosenwald would already have been reduced, desegregation resulting from enrollment in the magnet program would have all the more significant effect.

6) The plan takes into account the desires of the School Board and the community while it seeks to ensure that maximum desegregation is achieved. It does so by providing that a monitoring period be established during which the School Board will have the opportunity to bring before the community for a vote a bond issue which would provide funds for a new consolidated school facility. If successful, such a facility by nature would be desegregative.

In the interim period, the magnet program would be given an opportunity to work. If it does, it can be continued even if a consolidated facility is constructed and opened. If it is not successful, the plan provides that an alternative desegregation step can be put into effect.

The Consent Decree also provides, as required by the Fifth Circuit's remand,

that teachers be assigned to schools in accordance with the requirements of *Singleton v. Jackson Municipal Separate School District, supra.* Thus the plan establishes a comprehensive remedy which takes account of the geographic and demographic difficulties which adhere to efforts to complete desegregation of the Pointe Coupee schools."

Plaintiffs argue strongly that the proposed consent decree does not meet the requirements of the Constitution because it will leave Rosenwald High School virtually all black. Plaintiffs do not object to closure of Rosenwald addition.

The court has carefully considered the various proposals submitted and concludes that the consent decree is a valid, reasonable and constitutional plan for desegregating the Pointe Coupee Parish schools. The magnet school will be given an opportunity to work; if it does not work, then, as the government pointed out, the plan provides that an alternative desegregation step can be put into effect.

It is undisputed that the consent decree, if implemented, will desegregate both LaBarre and Poydras schools. The only real objection raised is that the magnet school will not effectively desegregate Rosenwald. In the opinion of the expert witness offered by the government, Dr. William Gordon, the proposed consent decree, if implemented, will completely desegregate the school system. Plaintiffs have offered argument, but no evidence, to the contrary.

 The court was impressed with the testimony of Superintendent James E. Kennison, who indicated that the Upper Pointe Coupee schools have already been voluntarily paired by the School Board. This voluntary step indicates a willingness on the part of the School Board (still not found in all local boards) to undertake the fulfilling of its constitutional obligations. The additional actions proposed in the consent decree indicate willing compliance with constitutional mandates, a factor to be favorably considered. *United States v. City of Jackson, supra.* In the final analysis, any local school system can be really desegregated only by the local people involved, when they become aware of and willing to discharge their constitutional obligations, in other words, when they begin to look for ways to make desegregation work, rather than for ways to make it not work. The actions previously undertaken by the Pointe Coupee Parish School Board and its adoption of the provisions of the consent decree indicate to the court that the Board is willing to undertake its responsibilities under the Constitution.

Under the circumstances, there is no necessity for an adjudication upon the merits and the School Board will not be required to "confess" that the system is not now unitary. The provisions of the consent decree do not impair the constitutional rights of plaintiffs. The school system will be desegregated; that is plaintiffs sole interest and the decree will protect that interest.

Since the court concludes that the constitutional rights of plaintiffs are not impaired by the adoption of this consent decree, the consent decree will be approved in its entirety and it will be ordered into effect.

Counsel for the United States is requested to prepare an appropriate order and to submit it to the court for signature.

## Appendix I

The April 1, 1981 enrollment of schools in the district by race and the racial percentages thereof was as follows:

| | | B | W | T | %B | %W |
|---|---|---|---|---|---|---|
| Upper Pointe Coupee | (k–6) | 273 | 84 | 357 | 76.5 | 23.5 |
| Upper Pointe Coupee | (7–12) | 333 | 57 | 390 | 85.4 | 14.6 |
| Morganza | (k–12) | 183 | 100 | 283 | 64.7 | 35.3 |
| LaBarre | (k–8) | 165 | 4 | 169 | 97.6 | 2.4 |
| Poydras | (k–12) | 113 | 288 | 401 | 28.2 | 71.8 |
| Rosenwald | (k–12) | 1031 | 0 | 1031 | 100.0 | – |
| Rougon | (4–12) | 211 | 218 | 429 | 49.2 | 50.8 |
| Lakeland | (k–3) | 90 | 133 | 223 | 40.4 | 59.6 |
| Livonia | (7–12) | 124 | 306 | 430 | 28.8 | 71.2 |
| Valverda | (k–6) | 131 | 339 | 470 | 27.9 | 72.1 |
| | | 2654 | 1529 | 4183 | | |

## Appendix "2"

3. To add the following appendices to the original proposal:

Appendix III

If our proposal were implemented the student assignment based on April 1, 1981 figures would be as follows:

Poydras Elementary
Capacity 783
k–6

| Grade | K | 1 | 2 | 3 | 4 | 5 | 6 | Total |
|-------|----|-----|----|----|-----|-----|-----|-------|
| Black | 74 | 78 | 70 | 78 | 77 | 111 | 84 | 572 |
| White | 22 | 23 | 19 | 21 | 26 | 33 | 20 | 164 |
| Total | 96 | 101 | 89 | 99 | 103 | 144 | 104 | 736 |

LaBarre K–6
Capacity 457

| Grade | K | 1 | 2 | 3 | 4 | 5 | 6 | Sp.Ed. | Total |
|-------|----|----|----|----|----|----|----|--------|-------|
| Black | 34 | 28 | 26 | 37 | 38 | 31 | 46 | 21 | 257 |
| White | 6 | 6 | 10 | 2 | 7 | 8 | 10 | 4 | 53 |
| Total | 46 | 34 | 36 | 39 | 45 | 39 | 52 | 25 | 342 |

Rosenwald 7–12
Capacity 1620

| Grade | 7 | 8 | 9 | 10 | 11 | 12 | Total |
|-------|-----|-----|-----|-----|-----|-----|-------|
| Black | 109 | 102 | 137 | 131 | 111 | 103 | 693 |
| White | 31 | 43 | 49 | 45 | 49 | 24 | 241 |
| Total | 140 | 145 | 186 | 176 | 160 | 127 | 934 |

Rougon 4–8
Capacity 528

| Grade | Sp.Ed | 4 | 5 | 6 | 7 | 8 | Total |
|-------|-------|----|----|----|----|----|-------|
| Black | 12 | 21 | 26 | 30 | 40 | 27 | 156 |
| White | 1 | 31 | 30 | 27 | 36 | 27 | 152 |
| Total | 13 | 52 | 56 | 57 | 76 | 54 | 308 |

Lakeland K–3
Capacity 245

| Grade | K | 1 | 2 | 3 | Total |
|-------|----|----|----|----|-------|
| Black | 25 | 24 | 25 | 16 | 90 |
| White | 48 | 27 | 30 | 28 | 133 |
| Total | 73 | 51 | 55 | 44 | 223 |