748 F.2d 941
 Volma OVERTON, et al., Plaintiffs,
v.
CITY OF AUSTIN, etc., et al., Defendants.
Appeal of Volma OVERTON, et al.
Volma OVERTON, et al., Plaintiffs,
v.
CITY OF AUSTIN, et al., Defendants.
Volma OVERTON, et al., Appellants,
and
Ernesto Calderon, et al., Appellants,
v.
CITY OF AUSTIN, et al., Appellants.
In re Volma OVERTON, Iola Taylor, John Hall, and others
similarly situated, Petitioners.
 Nos. 84-1745, 84-1835 and 84-1878.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 3, 1984.
 
 Schwartz, Waterman, Fickman & Van Os, David Van Os, Leonard J. Schwartz, Austin, Tex., Jose Garza, Mexican American Legal Defense & Educ. Fund, San Antonio, Tex., for appellants in Nos. 84-1745, 84-1878.
 Paul C. Isham, City Atty., Jonathan Davis, 1st Asst. City Atty., Austin, Tex., for other interested party.
 Schwartz, Waterman, Fickman & Van Os, David Van Os, Leonard J. Schwartz, Austin, Tex., for Volma Overton, et al. in No. 84-1835.
 Paul C. Isham, City Atty., Jonathan Davis, 1st Asst. City Atty., Austin, Tex., for City of Austin, et al. in No. 84-1835.
 Jose Garza, Belinda Herrara, Mexican American Legal Defense and Educ. Fund, San Antonio, Tex., for Ernesto Calderon, et al. in No. 84-1835.
 James R. Nowlin, U.S. Dist. Judge, Paul C. Isham, City Atty., Austin, Tex., for appellee in No. 84-1878.
 No Attys. for appellees in Nos. 84-1745, 84-1835.
 McCamish, Ingram, Martin & Brown, Austin, Tex., for amicus curiae Judge James R. Nowlin, R. Mark Dietz, Austin, Tex., of counsel.
 James V. Sylvester, Donald Scott Thomas, Jr., Austin, Tex., for amicus curiae--Council Member Mark Spaeth.
 Appeals from the United States District Court for the Western District of Texas.
 On Petition for Writ of Mandamus to the United States District Court for the Western District of Texas.
 Before THORNBERRY, GARWOOD, and HILL, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 This case involves the consolidated appeals of Black plaintiffs, Mexican-American plaintiffs-intervenors, and the defendant City of Austin, who seek relief from what they characterize as a refusal by the district court to approve and enter proposed consent decrees. The proposed decrees would have required the City of Austin to permanently adopt, beginning in April 1985, a city council election system having all eight councilmembers elected from single-member districts and a mayor elected at large, in lieu of its present system in which all six councilmembers and the mayor are elected at large. Plaintiffs and plaintiffs-intervenors had alleged that the existing at-large system impermissibly diluted the impact of minority votes in the City. Appellants characterize the district court's failure to promptly dispose on the merits of the proposed settlement and consent decrees as a refusal to grant injunctive relief, and seek to appeal under 28 U.S.C. Sec. 1292(a)(1). In addition, the Black plaintiffs seek a writ of mandamus ordering the district court either to "forthwith execute and file" the last tendered consent decree, or, alternatively, to issue a written order formally refusing approval and giving reasons therefor. We hold that there is no appealable final or interlocutory order, and dismiss the appeals. We also hold that the district court's deferral of immediate action without a hearing on the proposed consent decrees was at the least within its sound discretion, and accordingly we deny the application for writ of mandamus.
 
 PROCEEDINGS BELOW
 
 2
 On April 5, 1984, plaintiffs Volma Overton, Iola Taylor and John Hall ("plaintiffs") instituted these proceedings by filing a complaint in the court below on behalf of themselves and other Austin Black voters similarly situated. The City of Austin and its mayor and councilmembers, individually and officially, were named defendants. Plaintiffs alleged that black voters as a class, constituting "less than 12% of the electorate," have been and will continue to be deprived of rights guaranteed by the Constitution of the United States, the Civil Rights Acts of 1866, 1871, and 1964, and the Voting Rights Act of 1965, 42 U.S.C. Sec. 1973, et seq., as amended, by virtue of the "intentional racial discrimination incorporated into the at-large City Council election system pursued by the City of Austin." The complaint asserts that the City's at-large voting system impermissibly dilutes "the votes of Black citizens, denying them the right to vote, and denying them equal protection of the laws," and that under this system "Black citizens ... have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." It alleges that "[a] class action is the most efficient mechanism for addressing the issues herein and otherwise assuring that all affected persons will be adequately protected and represented." Plaintiffs sought the following relief: (1) "[t]hat the Court declare this matter to be a class action"; (2) "declare that the present at-large system ... [is] unconstitutional, illegal and violative of rights guaranteed to the Plaintiffs and others similarly situated under the Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution, the Civil Rights Acts of 1866 and 1871, and the Voting Rights Act of 1965, as amended"; (3) "order into effect a plan for the election of members of the Austin City Council which provides Plaintiffs and those similarly situated with a remedy for the violation of their rights as described above"; (4) "enjoin any further elections from taking place under said present plan." The complaint seeks no preliminary injunctive relief.
 
 
 3
 On April 12, "[t]he Black Citizens Task Force, an unincorporated association of black citizens in Austin" moved "to intervene as a defendant in this action," alleging in their proposed answer and counterclaim that plaintiffs were not proper class representatives, that Blacks were meaningfully represented on the city council since one of its seven members was Black while the Black electorate was twelve percent of the population, that the at-large system "provides a meaningful access to the election system by blacks" and is not unconstitutional or illegal, and "that a change to a single member district system of elections will dilute the actual influence of black voters in Austin" and violate the Voting Rights Act.
 
 
 4
 The defendants, represented by the Austin City Attorney, filed their answer April 27, admitting that Austin followed the at-large system of electing its city council but denying that it denied or abridged any of plaintiffs' rights under the United States Constitution or the Voting Rights Act and denying any discriminatory intent.
 
 
 5
 On April 30, plaintiffs filed their First Amended Complaint. This complaint is essentially the same as the original complaint, except that the class action allegations are omitted and the Austin Branch of the NAACP is added as a party plaintiff. The relief requested is exactly the same as in the original complaint, except that the request for a declaration that the case is a class action is omitted.[1] No preliminary injunctive relief is sought. The record does not reflect any notice to the putative class members of this amended complaint, nor any order of the court or consent of parties opposite respecting its filing. See Fed.R.Civ.P. 15(a), 23(e).
 
 
 6
 On May 1, plaintiffs and defendants each filed their respective oppositions to the Black Citizens Task Force's motion to intervene. On May 11, the Black Citizens Task Force, now joined by "Dorothy Turner and Velma Roberts, black citizens of Austin," filed an amended motion to intervene as defendants, alleging that various factors, including recent public statements by members of the city council favoring single-member council districts, "give rise to a question of collusion [between plaintiffs and defendants] or at least reasonable doubt as to whether the City could or would vigorously protect Applicant-Intervenors' interest," and that applicants for intervention were the only parties raising or likely to raise the issue of "dilution of black voting strength by going to a larger council with single member districts." On May 21, plaintiffs filed an opposition to this amended motion to intervene; the record discloses no response thereto by defendants.
 
 
 7
 On June 11, plaintiffs filed their "proposed scheduling order," calling for completion of discovery on October 15, attorneys' conference December 15, and "submit proposed pre-trial order" on January 15, 1985; this was amended June 18 to change the respective dates to October 1, November 1, and November 15.
 
 
 8
 Thereafter, on June 29, Ernesto Calderon, John Moore, and Ernest Perales (the "plaintiffs-intervenors") moved to intervene as plaintiffs, individually and on behalf of the class of "Mexican American citizens of the United States residing and registered to vote in the City of Austin, Travis County, Texas," for the purpose of "challenging the existing at-large, by place, majority vote system of election for members of the City Council of Austin, Texas as violative of their rights as secured under Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973, et seq., and the Fourteenth and Fifteenth Amendments of the U.S. Constitution." They alleged that "the granting of intervention will not delay the proceedings." No preliminary injunctive relief is sought. On July 6, plaintiffs filed a consent to this intervention, and on July 23, the district court entered an order granting the motion to intervene. The record does not reflect any class certification or definition order with respect to the putative Mexican-American class or any notice to the putative class, nor any request for either. See Fed.R.Civ.P. 23(c) & (e).
 
 
 9
 Two days later, on July 25, the district court denied the motion to intervene as defendants of the Black Citizens Task Force, Dorothy Turner, and Velma Roberts, but stated "[t]he Court shall accept amicus curiae briefs from these parties should they choose to provide the same to the Court." On August 3, the Black Citizens Task Force, Turner, and Roberts filed a motion under Rule 59, Federal Rules of Civil Procedure, to alter or amend the order denying them intervention, and requested a hearing thereon.[2] So far as the record reflects, this motion remains undisposed of.
 
 
 10
 Meanwhile, on July 31, the plaintiffs, the plaintiffs-intervenors, and the defendants, acting through the Austin City Attorney, filed a consent to dismissal without prejudice of the suit against the mayor and councilmember defendants in their individual capacities. No notice of this dismissal to members of the putative class or approval thereof by the court under Rule 23(e), Federal Rules of Civil Procedure, nor any request for any of same, appears of record.
 
 
 11
 The plaintiffs, plaintiffs-intervenors, and defendants then filed, on August 3, their "Joint Motion for Interim Order," stating that "[i]n order to avoid the expense, delay, and divisiveness of litigation in this matter, and in recognition of the requirements of the Constitution and laws of the United States, the parties hereto have agreed to resolve and settle this litigation," and moving the court "to issue an Interim Order," proposed form of which was attached to the motion. The motion states "that the next City Council elections are scheduled for April, 1985," that "the parties agree that" the present at-large system is in violation of the United States Constitution and the Voting Rights Act and that to be in compliance therewith requires that "beginning with the 1985 elections" the system be changed to one "by which eight (8) Council Members are elected from single-member districts, and the Mayor is elected at large." No facts claimed to show unconstitutionality or other illegality are stated.
 
 
 12
 The proposed form of "Interim Order" includes the following:
 
 
 13
 "NOW, THEREFORE, IT IS ORDERED, ADJUDGED and DECREED that:
 
 
 14
 "1. The current method of electing the Mayor and City Council of Austin amounts to a violation of the Fourteenth Amendment to the United States Constitution and the Voting Rights Act, 42 U.S.C. Sec. 1973 et seq., as amended 1982.
 
 
 15
 "2. Henceforth no elections shall be held under said current plan for the election of the Mayor and City Council of Austin.
 
 
 16
 "3. Contingent upon final approval of a plan of apportionment containing the boundary lines for eight single-member districts, the elections scheduled for April, 1985, shall be conducted under a plan by which eight City Council members are elected from single-member districts and the Mayor is elected at large.
 
 
 17
 "4. The parties shall have 45 days to submit for this Court's approval a final plan of election and apportionment containing the boundary lines for the eight single-member districts and any other related changes in the method of electing the City Council. Should the parties fail to present a plan or should the Court find the submitted plan not in compliance with Constitutional and statutory requirements, the court shall order an appropriate plan into effect."[3]
 
 
 18
 Apart from the noted recitals in the motion as to the parties' agreement, the record contains absolutely no evidence, by testimony, depositions, affidavits, answers to interrogatories or requests for admissions or otherwise, tending to show that the current method of electing the Austin mayor and city council is contrary to the United States Constitution or the Voting Rights Act. Nothing in the "Joint Motion" or proposed "Interim Order," or elsewhere in the record, provides for or requests any notice to putative class members concerning the settlement, the joint motion or the interim order, or any hearing on any of such matters.
 
 
 19
 On August 9, the district court, sua sponte, entered an order that the plaintiffs file all "pre-trial motions and briefs" within ten days (i.e., August 19), that the defendants respond within ten days thereafter, and that the plaintiffs have five days thereafter to submit their rebuttal.
 
 
 20
 The plaintiffs then, on August 13, filed their notice of appeal to this Court "from the Order refusing to sign the Interim Order" submitted with the August 3 "Joint Motion," stating that the appeal is brought "under 28 U.S.C. Section 1292(a)" and that the order appealed from "was orally entered in this action on the 8th day of August." No docket entry, minute entry, or other matter of record supports the assertion that any such order was made or entered on August 8, or at any other time. An affidavit submitted to us by plaintiffs-appellants' counsel states "[o]n August 8, 1984 ... a briefing attorney employed by the District Court, advised me that the District Court would not sign the proposed Interim Order, nor would the trial judge approve any settlement of the case, without evidentiary proof that the present system of electing the Austin City Council is unconstitutional" or, with respect to the Voting Rights Act, "without proof that the present system is unlawful," and "that the Judge would hold a hearing."[4] Nothing indicates that the substance of these oral remarks by the briefing attorney were ever repeated by the judge, or anyone else, in open court or in a conference with any of the attorneys, or were ever in any way memorialized or made any character of official order, by docket or minute entry or otherwise.
 
 
 21
 The appeal filed August 13 was docketed in this Court as No. 84-1745.
 
 
 22
 On August 14, plaintiffs-intervenors filed a motion for continuance in the district court reciting that "[p]laintiffs will require at least 60 days to pursue and complete discovery to prepare for trial of this action," and requesting that the "Court grant a 60 day extension of its [August 9] briefing and trial schedule." Plaintiffs joined in this request by motion filed August 15. Later the same day, the district court entered its August 15 order requiring that plaintiffs file all pretrial motions and briefs by October 19, 1984, that defendants respond with all pretrial motions and briefs ten days thereafter, and that plaintiffs respond to defendants' motions within five days thereafter. On August 16, the clerk issued notice that the case was set for nonjury trial on December 3, 1984.
 
 
 23
 Shortly thereafter, on August 20, the plaintiffs, plaintiffs-intervenors, and defendants filed a second Joint Motion for Entry of Consent Decree, with attached settlement agreement and form of consent decree. The settlement agreement recites that "[p]laintiffs have initiated suit claiming that the present at-large method of electing the City Council of Austin violates the Voting Rights Act of 1965, as amended 1982," that the parties "desire to compromise and settle this litigation in order to avoid further expense, delay and divisiveness," and that they agree that "elections for the Austin City Council, beginning with 1985, shall be conducted under a plan by which eight (8) Council members are elected from single-member districts, and the Mayor is elected at large," and that they will negotiate the boundaries of the districts, subject to court approval, or if they fail to agree on the boundaries the court will fix them, and they will be submitted to the Justice Department for preclearance. This proposed "Consent Decree" states in relevant part:
 
 
 24
 "In accordance with the parties' Settlement Agreement, the Court hereby enters the following Consent Decree:
 
 
 25
 "1. Future elections for the Austin City Council, beginning with 1985, shall be conducted under a plan by which eight (8) Council members are elected from single-member districts, and the Mayor is elected at large.
 
 
 26
 "2. As expeditiously as possible, the parties shall negotiate a plan of apportionment for the eight single-member districts.
 
 
 27
 "3. Immediately upon negotiation of such a plan, the parties shall submit the plan of apportionment to the U.S. Department of Justice for pre-clearance and approval pursuant to Section 5 of the Voting rights [sic ] Act, 42 U.S.C. Section 1973 et seq.
 
 
 28
 "4. Should the parties be unable to agree upon a plan of apportionment, they shall request the Court to receive evidence for the purpose of establishing the boundary lines of the eight districts. In such event, the Court-ordered plan shall then be submitted to the U.S. Department of Justice for pre-clearance and approval."
 
 
 29
 Neither the August 20 motion nor the settlement agreement nor the proposed consent decree contains any statement that the present method of election is illegal or discriminatory. No provision or request is made for any character of notice or hearing whatever in respect to the settlement or proposed consent decree.
 
 
 30
 On the same day, these parties filed an alternative motion requesting the district court, should it "deem the proposed Consent Decree illegal, unconstitutional, or otherwise improper," to in that event "enter a written Order denying the Consent Decree and setting forth the Court's reasons," it being stated that the parties were "entitled" to this "to guide their further negotiations" and "to properly inform the Court of Appeals."
 
 
 31
 On September 12, defendant Councilmember Spaeth, represented by separate counsel, filed in the district court his opposition to the entry of the proposed consent decree submitted August 20, stating that he did not agree to the proposed settlement, that in any event it "is invalid since the city defendants did not have the capacity under state law to enter into it," and that a hearing should be held before taking any action on the proposed decree.[5] No action has been taken on this motion.
 
 
 32
 Thereafter, the plaintiffs and the defendants, on September 14, filed their joint notice of appeal "from the trial court's denial of the Joint Motion for Entry of Consent Decree which was submitted by all parties on August 20, 1984," stating that the "trial court's denial of the proposed Consent Decree was orally communicated to the parties on August 21, 1984. Said denial is an appealable order under 28 U.S.C. 1292(a)." On Monday, September 17, the plaintiffs-intervenors filed their notice of appeal "from the District Court's refusal to approve the agreed interim order and party's [sic ] settlement agreement."[6]
 
 
 33
 The record contains no indication, by way of order, docket entry, or otherwise, that the district court denied or refused to approve, or otherwise acted on, the proposed consent decree or motion in connection therewith, or the "alternative motion." The above-referenced affidavit by plaintiffs' counsel states that on August 20, after these documents were filed, counsel sought but "were declined permission to confer with the Court. Instead we spoke again with the briefing attorney." The affidavit continues by stating what the briefing attorney said that the district court would or would not do in various circumstances, but does not refer to any action or order of the court.[7]
 
 
 34
 The appeal filed September 14 was docketed in this Court as our No. 84-1835.
 
 
 35
 On September 27, this Court granted the motion of plaintiffs and defendants, filed September 14, to consolidate and expedite the appeals, and the cases were set for oral argument October 24.
 
 
 36
 Thereafter, on October 8, plaintiffs filed in this Court (our No. 84-1878) an application for a writ of mandamus, seeking an order requiring the district court "to stay all further proceedings in the case below pending further order of this Court" and "to forthwith execute and file the Revised Consent Decree." Alternatively, it was prayed that the court below be required "to enter a written order either approving the Consent Decree or refusing to do so." We consolidated the mandamus with the appeals. Subsequently, as authorized by order of this Court, and pursuant to Rule 21(b), Federal Rules of Appellate Procedure, the district court, through counsel, filed an answer in the mandamus action, denying that it had denied either motion for entry of consent decree, and a supporting brief.[8] Neither plaintiffs-intervenors nor defendants have joined in the mandamus, as they respectively reiterated when questioned at oral argument.
 
 THE APPEALS
 
 37
 Appellants assert that their appeals are properly before us under that portion of 28 U.S.C. Sec. 1292(a)(1) allowing appeals from "[i]nterlocutory orders of the district courts ... refusing ... injunctions ...." No other basis of appellate jurisdiction is suggested, nor is any apparent to us. For purposes of section 1292(a)(1), "injunctions" includes both temporary and permanent injunctions, though not temporary restraining orders. Connell v. Dulien Steel Products, Inc., 240 F.2d 414, 417-18 (5th Cir.1957), cert. denied, 356 S.Ct. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958); Dilworth v. Riner, 343 F.2d 226, 229 (5th Cir.1965). With respect to the allowance of appeals under section 1292(a)(1), the federal courts have followed "a policy of construing the statute strictly." Wright, Miller, Cooper & Gressman, Federal Practice and Procedure: Jurisdiction Sec. 3921 at 10. Moreover, even where the requirements of section 1292(a)(1) are met, nevertheless we restrict "appellate review to the injunctive aspects of the district court's order." Association of Co-Operative Members, Inc. v. Farmland Industries, Inc., 684 F.2d 1134, 1138 (5th Cir.1982), cert. denied, 460 U.S. 1038, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983).
 
 
 38
 Applying these principles, we hold that the district court has issued no order appealable under section 1292(a)(1).
 
 
 39
 Appellants, plaintiffs and plaintiffs-intervenors, have made interlocutory requests for permanent injunctive relief, in that the proposed consent decrees in effect permanently enjoin the City to utilize, commencing with the April 1985 elections, a city council composed of a mayor elected at large and eight councilmembers elected from single-member districts, in lieu of the presently composed council consisting of seven members, including the mayor, all elected at large. The district court, however, has issued no order or ruling either denying or refusing to grant such relief. Nor can anything the court below has done or said be construed as indicating that the court will deny or refuse such relief. It is true that the district court has not yet granted such relief. But the mere failure to grant a permanent injunction is not the same as "refusing" it, at least where, as here, that is not the practical effect of the inaction. "An order that merely continues the case and does not reach the merits of the claim is nothing more than a step in the processing of the case and does not fall within Sec. 1292(a)(1). See Switzerland Cheese Ass'n v. E. Horne's Market, 385 U.S. 23, 25, 87 S.Ct. 193 , 17 L.Ed.2d 23 (1966); Baltimore Contractors, Inv. v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249 , 99 L.Ed. 233 (1955) ...." Rodgers v. United States Steel Corporation, 508 F.2d 152, 160 (3d Cir.), cert. denied, 423 U.S. 832, 95 S.Ct. 1386, 46 L.Ed.2d 50 (1975). With respect to temporary injunctive relief, none was requested below, either in the pleadings, the proposed consent decrees or otherwise. See Eluska v. Andrus, 587 F.2d 996, 1001 (9th Cir.1978); Rodgers at 160. There was no request below for any injunction which would require any change in the status quo prior to the April 1985 elections (or prior to the contemplated final judgment of the district court). Nor does anything in the record suggest that initial action by the district court on the request for injunctive relief in December 1984 or January 1985 will come too late, as a practical matter, to be able to afford plaintiffs and plaintiffs-intervenors the relief they seek to obtain by their requests for injunction, namely, a city council composed, commencing April 1985, of a mayor elected at large and eight councilmembers elected from single-member districts. Indeed, there is nothing in the record to indicate that appellants ever advised the district court that they felt otherwise, or that court action in December or January would not be in time to workably effect a change in the April elections. To the contrary, plaintiffs' initial proposed scheduling order called for the proposed pretrial order to be filed January 15, later amended to November 15; the district court had evidently set a hearing in the case for September, and, at the request of plaintiffs and plaintiffs-intervenors, this was postponed to December 3.
 
 
 40
 Accordingly, section 1292(a)(1) is inapplicable under the rule that "[o]rders that merely postpone processing of a case in which permanent injunctive relief is sought, on the other hand, should not be found to deny an injunction if no preliminary injunction has been sought." Wright, Miller, Cooper & Gressman,Federal Practice and Procedure: Jurisdiction Sec. 3924 at 71.
 
 
 41
 Appellants rely mainly on Carson v. American Brands, Inc., 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). That was a Title VII suit by private employees against their private employer, seeking both preliminary and permanent injunctive relief, in which the Supreme Court held that the district court's denial of a proposed consent decree, containing immediately effective injunctive provisions, was an appealable order under section 1292(a)(1). Carson, however, is inapposite on several accounts. To begin with, the Carson plaintiffs, who specifically sought "a preliminary and permanent injunction" as the "only means of securing adequate relief," alleged that, absent the requested injunctive relief, they would "suffer irreparable injury," and requested advancement on the docket and "a speedy hearing at the earliest practicable date." Id. 101 S.Ct. at 999 n. 15 (emphasis added). The proposed consent decree which the district court there refused to enter would have required a change in the status quo immediately upon its entry. As the Supreme Court stated:
 
 
 42
 "In seeking entry of the proposed consent decree, petitioners sought an immediate restructuring of respondents' transfer and promotional policies. They asserted in their complaint that they would suffer irreparable injury unless they obtained that injunctive relief at the earliest opportunity. Because petitioners cannot obtain that relief until the proposed consent decree is entered, any further delay in reviewing the propriety of the District Court's refusal to enter the decree might cause them serious or irreparable harm." Id. at 999 (footnotes omitted).
 
 
 43
 Here, by contrast, no preliminary injunctive relief or expedited hearing was requested, and the injunctive relief requested in the pleadings and provided for by the proposed consent decrees would not require any immediate change in the status quo, but only a change in time for the April 1985 elections, which change could still workably be effected by an injunctive order issued in the course of later, orderly processing of the case.
 
 
 44
 Moreover, in Carson, the district court clearly ruled on the proposed consent decree and entered an order denying the motion to enter it, together with an opinion stating its reasons.[9] Here, the district court has not denied or refused the motion to enter the consent decrees, and has made no order, written or oral, in that regard. Indeed, only ten days transpired between the filing of the joint motion for entry of the consent decrees and the time that plaintiffs first gave notice of appeal. While section 1292(a)(1) appealability requires that there be a "granting, continuing, modifying, refusing or dissolving ... or refusing to dissolve or modify" an injunction, it also requires that this be done by order. Massachusetts Association for Retarded Citizens v. King, 643 F.2d 899, 904 (1st Cir.1981). Without undertaking an all-encompassing definition of an "order," nothing in the record before us tends to reflect any written or oral "order" of the district court refusing any requested injunctive relief. Certainly a briefing attorney's out-of-court oral answers to an attorney's out-of-court oral inquiries as to the district court's intentions or thoughts about a case are not court orders. Cf. King.[10]
 
 
 45
 Where temporary, immediately effective injunctive relief is requested and the court fails to rule after a hearing, we have held that in a proper case such failure may satisfy the "order" requirement of section 1292(a)(1). See United States v. Lynd, 301 F.2d 818 (5th Cir.), cert. denied, 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed.2d 125 (1962). Lynd, however, is a far cry from this case. There the United States sought temporary and permanent injunctive relief against local voter registration officials to prevent their continued racial discrimination against black voter registration applicants. Nearly eight months had gone by following the filing of the motion for a temporary injunction, without any action by the district court, before it was finally set for hearing. Id. at 820. This Court's recitation of the history of the case is replete with examples of the district court's having placed extreme if not wholly unreasonable requirements upon the government respecting particularized proofs of the underlying complaint, and of having granted questionable dilatory pleas and motions by defendants. At the long-delayed temporary injunction hearing, "the witnesses produced by the government proved without question that certain serious discriminations had taken place." Id. at 821. The government "made a clear showing that rights which it sought to vindicate were being violated." Id. at 823. When the government rested, the defendants asked for a thirty-day recess to prepare their case. The government then asked for an immediate temporary injunction, and the district court, without expressly ruling on this request by the government, thereupon granted a thirty-day recess of the hearing to permit defendants to prepare to put on their defensive case. That immediately effective relief was vital in Lynd is evident from this Court's having granted an injunction pending the appeal (from the refusal of the temporary injunction) "[i]n view of the immediate pendency of termination of registration proceedings prior to an early election." Id. at 823.
 
 
 46
 Lynd is hence inapplicable here because no temporary injunctive relief was sought, and because the court's inaction did not deny or render impractical the granting of the injunctive relief plaintiffs sought. In these circumstances, mere inaction is not an order refusing injunctive relief, and is not appealable.
 
 
 47
 Moreover, even where an immediately effective temporary injunction is requested, and a hearing held, the district court normally is not required to rule forthwith. Even in such circumstances, the mere failure to grant the temporary injunction is not appealable unless "there has been an abuse of discretion on the part of the District Judge." Davis v. Board of School Commissioners of Mobile County, Alabama, 318 F.2d 63, 64 (5th Cir.1963). Although there had been a hearing, and a prima facie case of entitlement to and need for immediate temporary injunctive relief had been made out, we held in NAACP v. Thompson, 321 F.2d 199, 202-03 (5th Cir.1963), that it was not an abuse of the trial court's discretion "to require time for a study of the record and the applicable law," and that, therefore, the trial court's inaction respecting the requested temporary injunction pending such study was not appealable under section 1292(a)(1). We remarked in Thompson that our decision in Davis made it plain that "it does not follow [from Lynd ] that every failure of a trial court to grant a temporary injunction is tantamount to a 'refusal' of such injunctive relief." Id. at 202. For the reasons stated below in our discussion of the mandamus, we find no abuse of discretion on the part of the district court in deferring action on the proposed consent decrees.
 
 
 48
 We hold that the appeals must be dismissed as there is no appealable order.
 
 THE MANDAMUS
 
 49
 Where parties to a case in the district court seek from the Court of Appeals a writ of mandamus directed to the district judge, the Supreme Court has stated that " 'only exceptional circumstances amounting to a judicial "usurpation of power" will justify the invocation of this extraordinary remedy.' " Kerr v. United States District Court, 426 U.S. 394, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976) (quoting with approval from Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967)).
 
 
 50
 Nothing even remotely approaching a "usurpation" is reflected here. Under the circumstances of this case, we think it plain that the district judge did not abuse his discretion in deferring action on each proposed consent decree pending an evidentiary hearing as to its appropriateness.
 
 
 51
 The considerable discretion of the district court in acting on proposed consent decrees, even in Title VII cases, is made clear by our en banc opinions in Williams v. City of New Orleans, 729 F.2d 1554 (5th Cir.1984), and United States v. City of Miami, Florida, 664 F.2d 435 (5th Cir.1981).[11] As we stated in City of Miami:
 
 
 52
 "The court, however, must not merely sign on the line provided by the parties. Even though the decree is predicated on consent of the parties, the judge must not give it perfunctory approval.
 
 
 53
 "....
 
 
 54
 "When presented with a proposed consent decree, the court's duty is akin, but not identical to its responsibility in approving settlements of class actions, stockholders' derivative suits, and proposed compromises of claims in bankruptcy. In these situations, the requisite court approval is merely the ratification of a compromise. The court must ascertain only that the settlement is 'fair, adequate and reasonable.'
 
 
 55
 "Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of record, whether established by evidence, affidavit, or stipulation. If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed." Id. at 440-41 (emphasis added; footnotes omitted).
 
 
 56
 In holding that the district court did not abuse its discretion in refusing to approve a part of a consent decree, we approved the foregoing language from City of Miami. Williams, 729 F.2d at 1559-60. We particularly stressed the need for careful scrutiny by the district court where "the decree has the potential to affect third parties," id. at 1560, and went on to state that because
 
 
 57
 "the litigation and settlement were instigated by a class of private plaintiffs which did not have any responsibility toward third parties who might be affected by their actions ... the district court had to bear the full responsibility in this case to safeguard the interests of those individuals who were affected by the decree but were not represented in the negotiations." Id.
 
 
 58
 The parallel to the present case is evident. Other passages in Williams likewise make plain the "substantial" discretion of the trial judge in acting on proposed consent decrees, viz:
 
 
 59
 "[T]his Court has held that the district court is entitled to a substantial measure of discretion in dealing with consent decrees, and that as a result, 'on appeal, our duty is to ascertain whether or not the trial judge clearly abused his discretion ...'. [Id. at 1558 (footnote omitted) (quoting Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir.1977).]
 
 
 60
 "....
 
 
 61
 "(T)he district court's denial of the present proposed decree is to be reviewed under the abuse of discretion standard. And we make no distinction based upon whether the district court approved or refused to approve the proposed settlement." [Id. at 1559 (emphasis added).]
 
 
 62
 If, as we clearly held in Williams, the district court has substantial discretion to approve or disapprove a proposed consent decree after an evidentiary hearing, then it necessarily follows that the district court has at the very least the discretion, if not indeed the duty, to hold such a hearing before acting one way or another on the proposed decree, at least where, as here, the decree has significant potential to affect third parties and the delay which may be occasioned by such a hearing is not shown to preclude timely and workable implementation of the substantive relief sought.[12]
 
 
 63
 Other factors present in the case at bar likewise demonstrate that there was no abuse of discretion in the district court's deferral of action on the proposed consent decrees.
 
 
 64
 To begin with, there are unresolved class action matters. Without going into the question of whether plaintiffs properly amended their pleadings to eliminate their class action allegations after answer but without court (or opposite party) approval,[13] we note that plaintiffs-intervenors' current pleadings clearly seek class relief and their designation as class representatives, and that no class action or class representative determination has ever been made or requested under Rule 23(c), Federal Rules of Civil Procedure. The Manual for Complex Litigation states: "Ordinarily, a class action determination should be made before any settlement negotiations occur." Sec. 1.46 at 59; cf. McDonald v. Chicago Milwaukee Corp., 565 F.2d 416, 419 n. 3 (7th Cir.1977). Without regard to whether a putative class action must be treated as a proper class action for purposes of Rule 23(e) prior to a class action determination under Rule 23(c), see Wright & Miller, Federal Practice and Procedure: Civil Sec. 1797 at 236-37, it seems evident that the district court at least has discretion to so treat it.[14]
 
 
 65
 The district court here was asked to approve consent decrees effecting a permanent restructuring of the composition and method of election of the Austin city council on the ground that the requested restructuring was required to vindicate the rights of Blacks and Mexican-Americans under the United States Constitution and the Voting Rights Act. It was asked to do so by individual plaintiffs (and one private group) who claimed to have abandoned their earlier asserted status as representatives of Blacks as a class, and by individual Mexican-Americans whose pleading sought the right to represent Mexican-Americans as a class but as to whom no class action hearing had been had or requested. Other Black individuals had advised the court of their view that the proposed restructuring would result in "dilution of black voting strength"; that, under the present system, the voting rights of Blacks were not impaired and Blacks were provided "meaningful access to the election system"; and that there was a reasonable doubt whether the interests of Blacks, other than the plaintiffs, would be adequately protected by existing parties. A city councilmember advised the court that the proposed settlement was beyond the power of the city council, as being contrary to provisions of the Texas Constitution and statutes, which require voter approval of city charter changes, unless the present system were found to violate federal law. An at-large election system is not necessarily, or per se, violative of the rights of minorities under the United States Constitution or the Voting Rights Act, Jones v. City of Lubbock, 727 F.2d 364 (5th Cir.1984), nor is a nine-member council necessarily more favorable to minorities than one of seven or some other number of members. The district court was not required to blindly accept without a hearing the ipse dixit of these particular Black or Mexican-American parties or the current members of the Austin city council respecting these matters, when such acceptance would permanently restructure the composition and method of election of the city council in a manner which is contrary to the city charter and which affects the rights of numerous persons, minorities and others, who are not parties to the settlement. Here, the rights of third parties are involved to a unique degree, unlike cases such as Carson v. American Brands.
 
 
 66
 Another aspect of the proposed consent decrees deserves consideration. It is undisputed that the City of Austin is a "home-rule" city and that its charter provides for a city council composed of seven persons, each elected at large.[15] It is likewise plain that under the Constitution and laws of Texas, a change in the charter of a home-rule city may not be effected by the city council itself, but instead requires a vote of the people. See Tex.Const. art. XI, Sec. 5; Tex.Rev.Civ.Stat.Ann. arts. 1165, 1170. The validity of these provisions is unchallenged and unquestioned. In Wise v. Lipscomb, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), the district court, following an evidentiary trial on the merits, held that the at-large system by which all members of the Dallas city council were elected diluted the voting strength of Black citizens in violation of the United States Constitution, and then afforded the city council an opportunity to formulate a plan which would meet constitutional standards. The city council proposed a mixed at-large and single-member district plan, and the district court, following another evidentiary hearing, held that the council's mixed plan was constitutional. The council then adopted the mixed plan, the district court again approved it in a memorandum opinion, and a few days later the city council election was held pursuant to that plan. The following year, while the case was still on appeal to this Court, the mixed plan was incorporated into the city charter by a vote of the people.[16] The district court in its opinion stated:
 
 
 67
 "The voting system of Dallas is established by the City Charter which was adopted by a majority vote of the voters of the City. Changes to the voting system necessarily are changes to the Charter and absent a judicial determination of unconstitutionality, such changes can only be effected by a Charter Amendment adopted by the voters.
 
 
 68
 "It is a City Charter provision which was at issue here, not a mere ordinance. A majority vote of the registered voters of the City is required to change the Charter. The members of the City Council, cannot, on their own modify the Charter to alter the voting scheme.... If defendants had attempted to unilaterally change the voting plan, absent a vote of the people or a ruling from a court with proper jurisdiction that a provision of the Dallas City Charter was constitutionally invalid, they would have been acting unlawfully." Lipscomb v. Wise, 399 F.Supp. 782, 799-800 (N.D.Tex.1975).
 
 
 69
 In the opinion announcing the Supreme Court's judgment, Justice White stated:
 
 
 70
 "Although the Council itself had no power to change the at-large system as long as the Charter provision remained intact, once the Charter provision was declared unconstitutional and, in effect, null and void, the Council was free to exercise its legislative powers which it did by enacting the eight/three plan. 399 F.Supp., at 800 ...." Wise v. Lipscomb, 98 S.Ct. at 2499.[17]
 
 
 71
 Accordingly, the proposed consent decree here, unlike those in cases such as Carson v. American Brands, call for the parties thereto, including the city council and its members in their official capacities, to take action which is beyond the power and jurisdiction of those parties under unquestioned provisions of state law. The court here is not being asked merely to put its sanctions behind a substantive result that the parties would be empowered to achieve themselves, as in the case of the usual consent decree; rather, it is being asked to effectuate a substantive result which the parties wholly lack the jurisdictional power to bring about by themselves.[18] Thus, more is necessarily involved than merely ascertaining whether the parties have consented to an ultimate result which is not of itself illegal, unreasonable or unfair. Absent a properly grounded judicial determination that the present charter provisions are illegal, the consent of the parties provides an insufficient basis on which to judicially ordain a different system of council election and composition. We note in this connection that the mandamus petition is directed only to the "Revised Consent Decree" filed with the district court on August 20, which we are requested to order the district court "to forthwith execute and file." As previously observed, this version of the parties' proposed consent decree contains no recital, finding or adjudication of any illegality in the present structure or method of election of the council; nor is any recital to that effect contained in the settlement agreement or motion to enter the revised consent decree also filed on August 20.[19]
 
 
 72
 These additional considerations reinforce our firm conclusion that the district court at the very least had the discretion, if indeed it did not have the plain duty, to defer action on the proposed consent decree pending an evidentiary hearing.
 
 
 73
 Apart from the abuse of discretion question, moreover, there are other conditions for the issuance of mandamus, one of which is that the party seeking such relief have no other adequate remedy. Kerr v. United States District Court, 426 U.S. 394, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976). If review is available by appeal, mandamus will not lie. Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953); Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 63 S.Ct. 938, 942-44, 87 L.Ed. 1185 (1943). See also Kerr, 96 S.Ct. at 2124 ("[A]s a general rule 'appellate review should be postponed ... until after final judgment has been rendered by the court.' ") (quoting Will v. United States, 389 U.S. 90, 88 S.Ct. 269, 274, 19 L.Ed.2d 305 (1967)). The district court has not denied either proposed consent decree, but merely has deferred ruling pending a hearing, and there has been no showing that this deferral precludes workable and timely implementation of the injunctive relief being sought. Should the requested relief ultimately be denied, any error in such denial may be reviewed on appeal. Plaintiffs assert that they will be unnecessarily put to the burden of a hearing. Even were a hearing unnecessary or improper, however, that would not be a sufficient ground for mandamus. That "hardship may result from delay and perhaps unnecessary trial," or that a ruling may "give rise to a myriad of legal and practical problems as well as inconvenience," is not alone a sufficient reason to invoke mandamus to control the interlocutory rulings of the trial court, even though they may be clearly wrong. Bankers Life & Casualty Co., 74 S.Ct. at 148. See also Roche, 63 S.Ct. at 943, 944; Will v. United States, 88 S.Ct. at 274, 278. We stated in Plekowski v. Ralston-Purina Co., 557 F.2d 1218, 1220 (5th Cir.1977):
 
 
 74
 "Expense and inconvenience, without more, do not justify the issuance of mandamus.
 
 
 75
 "....
 
 
 76
 "Undoubtedly, plaintiff has been frustrated by the proceedings thus far in the prosecution of his case and it may be that ultimately an expensive retrial may be necessary. However, we find nothing extraordinary in these circumstances that should cause us to resort to such a drastic remedy."
 
 
 77
 Compare Elster v. Alexander, 608 F.2d 196, 197 (5th Cir.1979). These principles also establish that mandamus is inappropriate here.
 
 
 78
 Finally, "it is important to remember that issuance of the writ is in large part a matter of discretion with the court to which the petition is addressed." Kerr, 96 S.Ct. at 2124. To the extent that we have discretion in the matter, we decline to issue the writ, for the reasons heretofore expressed.
 
 CONCLUSION
 
 79
 Accordingly, the appeals are each DISMISSED for want of an appealable order. The petition for writ of mandamus is DENIED.
 
 
 
 [1]
 The amended complaint also omits from its prayer for declaratory relief the previous reference to the rights of "others similarly situated."
 However, the amended complaint, like the original, recites that "[t]his is a proceeding to vindicate the rights of Black citizens of Austin, Texas ...."
 
 
 [2]
 On August 3, 1984, these same parties also filed a motion requesting the court to abstain from approving or denying any settlement until the matter of whether the defendants had the authority to enter into the settlement agreement had been resolved in state court. This motion stated that a lawsuit had been filed in state court "to determine whether the city council may agree to terms in a settlement [without approval] by the voters of Austin." This motion likewise remains pending and undisposed of
 
 
 [3]
 The interim order also calls for the final court-approved plan to be submitted to the "U.S. Justice Department for expedited approval" under section 5 of the Voting Rights Act, and provides "the Defendants shall amend the Charter of the City of Austin to comply with said plan."
 
 
 [4]
 This affidavit was submitted in connection with plaintiffs' below-referenced petition for writ of mandamus. A brief filed in this Court on behalf of the district court in response to the plaintiffs' petition for writ of mandamus states:
 "The District Judge by and through his briefing attorneys informed the parties that the Court would not enter the Order without a hearing. The parties were orally informed the Court would require an evidentiary fairness hearing. The Court would require proof of the allegations made in plaintiffs' complaint such as to make a prima facie case."
 
 
 [5]
 In a supporting memorandum filed the same day, Spaeth argued that the number of members and the at-large method of election of the Austin city council were fixed by its charter, and hence under the Texas Constitution (art. XI, Sec. 5) and statutes (Tex.Rev.Civ.Stat.Ann. art. 1165) could not be changed by the council, but only by a vote of the people, unless they were contrary to the United States Constitution or an act of Congress, which would have to be demonstrated by evidence. The memorandum further argued that "[t]he Court is certainly entitled to conduct some form of review before ordering changes to the City of Austin's voting system" and "[i]n the present case, there is no record upon which the Court can be satisfied that the proposed consent decree is supported by facts."
 
 
 [6]
 This notice of appeal continues by stating: "The parties to this action filed settlement proposals with the Court on August 3, 1984 and on August 20, 1984. The District Court, by Order of August 16, 1984, has set this case for trial for December 3, 1984, thus refusing to approve the settlement of the parties enjoining the current at-large elections."
 The reference to the August 16 order makes it appear that this notice of appeal relates to a claimed refusal to approve the August 3, rather than the August 20, proposed consent decree.
 
 
 [7]
 The affidavit states:
 "[The City Attorney] asked [the briefing attorney] how the Judge would react if the City stipulated with the Plaintiffs as to underlying facts necessary for a conclusion of unlawfulness or unconstitutionality as to the present system of electing the City Council. The briefing attorney stated again that no matter what stipulations were entered into, the Judge required an adversary proceeding.
 "... On August 21, 1984, I telephoned the briefing attorney to ascertain what action the District Court would take .... The briefing attorney stated that the Court would not sign the Consent Decree, nor would it take any action on the alternative Motion for Written Order Denying Consent Decree."
 The referenced brief filed on behalf of the district court in the mandamus proceeding states:
 "Since that date [August 15] the Court has entered no further orders. Plaintiffs and defendants presented to the Court a new settlement agreement and a joint motion for entry of consent decree on August 20, 1984. The Court has taken no action on these motions."
 The reply to the mandamus application filed on behalf of the district court specifically denies that the district court either denied the consent decree, or made any requirement for an adversarial trial on the merits.
 
 
 [8]
 Councilmember Spaeth also filed in this Court, on October 11, his "Motion for Determination of Status As A Party Or, Alternatively, Motion To Intervene." We carried this motion with the case, granting him leave to appear as amicus. Due to our disposition, a ruling on this motion by this Court is no longer appropriate
 
 
 [9]
 The reasons given were essentially in conflict with the Supreme Court's opinion in United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), reh. denied, 444 U.S. 889, 100 S.Ct. 193, 62 L.Ed.2d 125 (1979). Here, the district court has made no merits-related ruling
 We note that Carson also differs from the present case in other relevant respects. Carson was a Title VII case and the Court was influenced by the express policy of that statute favoring settlement. 101 S.Ct. at 998 n. 14. No such statutory policy is present here. Moreover, in Carson, there were no pending, unresolved motions or other unmet procedural prerequisites. See id. at 995 n. 2. Here, by contrast, there has been no class certification hearing or order, nor any notice as provided for by Rule 23(e), Federal Rules of Civil Procedure. Moreover, here, unlike Carson, objections have been lodged to the proposed consent decrees.
 Appellants also rely on United States v. City of Alexandria, 614 F.2d 1358 (5th Cir.1980). However, City of Alexandria is inapposite for essentially the same reasons that Carson is. In City of Alexandria, the district court entered an order which plainly denied and refused the proposed consent decree, the injunctive provisions of which would have required immediately effective action. Here, as noted, there is no order, and no denial or refusal of the proposed consent decrees, and the district court's deferral of action does not delay the effectiveness of the injunctive provisions of the decrees. The district court, in City of Alexandria, relied on its own opinion in Weber, which had been reversed by the Supreme Court by the time we acted in City of Alexandria. Id. at 1363. City of Alexandria, like Carson, was a Title VII case. In City of Alexandria, there was no unresolved procedural matter, no putative class action, and no trial or appellate opposition to the decree or defense of the trial judge's disapproval of it. Id. at 1360-61. We relied heavily on the Justice Department's approval and the uncontradicted statistical information contained in the complaint and other documents before the trial court, which made a prima facie factual showing of Title VII violations. Id. at 1365-67.
 
 
 [10]
 See also Fed.R.Civ.P. 79(a) ("[A]ll ... orders ... and judgments shall be entered ... in the civil docket .... These entries ... shall show ... the substance of each order or judgment of the court ...."); 77(b) (court may act "in open court" or "in chambers"); 77(d) (clerk to serve notice "upon the entry of an order or judgment")
 Rule 60(a), Federal Rules of Civil Procedure, and Rule 10(e), Federal Rules of Appellate Procedure, each provide a mechanism for correcting omissions from the record. These mechanisms have not been invoked, nor is there any suggestion that if they were the result would be to reflect anything fairly describable as an order refusing requested injunctive relief.
 
 
 [11]
 We refer particularly to Judge Rubin's opinion in City of Miami, as, with respect to those portions of that opinion which are presently relevant, there appears to be no conflict between it and the view of those joining in Judge Gee's opinion. Moreover, Judge Rubin's opinion is cited with approval in these respects in Williams
 
 
 [12]
 The plaintiffs, mandamus petitioners, rely on City of Alexandria. It is properly distinguished for the reasons stated in note 9, supra. In Williams, we pointed out that City of Alexandria was "an exception to the general rule of 'abuse of discretion' review," Williams at 1558, based on "exceptional circumstances," id. at 1559, and that we reviewed the consent decree de novo in City of Alexandria only because the district court disapproved it without a hearing. Id. at 1558, 1559, 1561 n. 7. Nothing in City of Alexandria remotely suggests that the district court there would have erred, much less abused its discretion, by requiring an evidentiary hearing before it acted on the proposed consent decree. We also pointed out in Williams the importance of the Justice Department's being one of the two parties to the decree, a factor present in both City of Alexandria and City of Miami, but not here or in Williams. Id. at 1560. Williams plainly reflects that the mere presence of the city as a party to the consent decree does not obviate the need for the district court to give especially careful scrutiny where the decree has the potential to affect third parties
 
 
 [13]
 Cf. Fed.R.Civ.P. 15(a), 23(e); Wright & Miller, Federal Practice and Procedure: Civil Sec. 1797 at 236-37
 
 
 [14]
 Similarly, for example, even where Rule 23(e) by its terms would not apply to an involuntary dismissal of a putative class suit on grounds that it is not maintainable as a class action, nevertheless "the court may choose to give [Rule 23(e) ] notice in order to enable nonparty class members to participate in the decision making process." Wright & Miller, Federal Practice and Procedure: Civil Sec. 1797 at 235-36
 
 
 [15]
 See also Smith v. City of Port Arthur, 62 S.W.2d 385, 386 (Tex.Civ.App.--Beaumont 1933, no writ) (judicial notice taken of provisions of city charter); Farmer v. State, 43 S.W.2d 588, 589 (Tex.Crim.App.1931) (judicial notice that Austin is an incorporated city); City of Sweetwater v. Foster, 37 S.W.2d 799, 800 (Tex.Civ.App.--Eastland 1931, no writ) (courts take judicial notice of city charters under the Home Rule Act)
 
 
 [16]
 The district court's ruling that the original at-large provisions of the charter were unconstitutional was made on January 17, 1975, following trial; the mixed plan was proposed by the council on January 24, and approved by the court on February 8, following another hearing; it was adopted by the council on February 10; the district court's written opinion was issued March 25; elections under the mixed plan were held April 1, 1975; in April 1976, while the case was pending (undecided) before this Court, the people of Dallas amended the charter to incorporate the mixed plan. The city did not appeal the district court's judgment, but minority voters did, contending that the "mixed" plan was inadequate to vindicate their rights
 
 
 [17]
 Justice White also noted that this Court had not disagreed with the district court in this respect. Id. Justice Stewart concurred in Justice White's opinion. Justice Powell, in whose opinion the Chief Justice and Justices Blackmun and Rehnquist joined, agreed that "the City Council ordinarily would have had no power to reapportion itself," and questioned "the assumption" that it would have such power once the charter was declared invalid. 98 S.Ct. at 2501. Justice Powell concluded, however, that even if the council lacked such power, its action should nevertheless be considered as "legislative" for purposes of the "rule of deference to local legislative judgments" employed by federal courts to sustain, as against federal constitutional attack, state or local legislative reapportionment schemes. Id. The dissenting opinion of Justice Marshall, concurred in by Justices Brennan and Stevens, states:
 "Under the terms of its Charter, the Dallas City Council could reapportion itself only by a popular referendum. See Tex.Const., Art. XI, Sec. 5; Tex.Rev.Civ.Stat.Ann., Art. 1170 (Vernon Supp.1978). The Council unquestionably failed to comply with the existing state procedures for enacting a reapportionment plan; indeed, the District Court itself noted that, were the Dallas City Council not responding to a judicial finding of unconstitutionality, it would have been acting unlawfully in unilaterally reapportioning itself. 399 F.Supp. 782, 800 (N.D.Tex.1975)." 98 S.Ct. at 2503 (emphasis added).
 Hence, it appears that all nine Justices were in agreement with the emphasized language of the above-quoted portion of Justice Marshall's opinion.
 Our attention has been called to cases in which a Texas city's or county's conveyance of land to another state or local governmental entity (such as the State Highway Department or a school district) having the power under state law to condemn such land (even though it was owned by the grantor governmental entity) has been upheld despite noncompliance with statutes generally restricting the grantor entity's power to convey, such as Texas Revised Civil Statutes Annotated articles 1019, 1112 (preventing a city from selling parkland without voter approval), or article 1577 (requiring a county to sell its land at public auction), and despite the fact that actual condemnation was not undertaken. See City of San Antonio v. Congregation of the Sisters of Charity of the Incarnate Word, 360 S.W.2d 580 (Tex.Civ.App.--Waco 1962, writ ref'd n.r.e.), cert. denied, 372 U.S. 967, 83 S.Ct. 1093, 10 L.Ed.2d 131 (1963); El Paso County v. City of El Paso, 357 S.W.2d 783 (Tex.Civ.App.--El Paso 1962, no writ); Kingsville Ind. School Dist. v. Crenshaw, 164 S.W.2d 49 (Tex.Civ.App.--San Antonio 1942, writ ref'd w.o.m.). See also Bolton v. City of Waco, 447 S.W.2d 718 (Tex.Civ.App.--Waco 1969, writ ref'd n.r.e.). Plaintiffs would apparently have us read decisions to this effect as establishing the proposition that the city council can unilaterally determine that the city charter is illegal and hence provide, without a referendum, for a council composition and method of election different than that specified in the charter.
 We do not so read these cases. Rather, they seem to rest on the theory that the cited restrictive statutes simply do not "apply to the proposed sale or transfer to another political subdivision that would use the property for public use or benefit," El Paso County, 357 S.W.2d at 786, or that since "[t]he power granted the State [the grantee] to condemn is not subject to consent of the electorate, ... so ... the concomitant authority of the City to convey without being subjected to condemnation is not so restricted," City of San Antonio, 360 S.W.2d at 583. Similarly, where the city takes the property for its own public use for which it has the statutory power of condemnation, the statutory referendum restrictions do not apply. Bolton, 447 S.W.2d at 720 (citing City of San Antonio ). These cases accommodate two partially overlapping Texas statutory schemes, and give precedence, over the general statutory sales restrictions, to the public use decisions of the governmental bodies having power to condemn the land. Here, however, we are dealing with a Texas constitutional provision requiring voter approval for charter changes, and the changes at issue relate to the composition and election of the council itself.
 Perhaps the foregoing cases might furnish remote analogous support for the proposition that the council should be deemed to have some character of power to respond, without voter approval, to a court decision invalidating the charter, just as it has the power to respond, without the otherwise required voter approval, to a public use decision made by another governmental entity having the relevant power of condemnation (or to its own public use decision, where it takes the land for public purposes for which it has the statutory power to condemn, as in Bolton ). But such an analogy assumes a court decision invalidating the charter. No provision of Texas law purports to give the council, acting alone or in concert with private parties such as plaintiffs here, the power either to amend or to determine the validity of the charter. Of course, the federal court has the power to invalidate the charter as being contrary to federal law, but the court's power to do so flows from, and is limited by, federal law, and is in no sense subject to enhancement or diminishment by the agreement or disagreement of the council and/or the private parties.
 
 
 [18]
 This distinction is applicable not only to employee-private employer Title VII suits, such as Carson v. American Brands, but also to municipal employee-city employer Title VII suits, such as City of Alexandria, where there is no question that the city council is the proper and duly empowered body to make the relevant employment decisions. Compare also section 23.024, Texas Education Code Annotated (allowing the board of trustees of certain independent school districts to itself change the method of its members' election from at large to single-member district or to a mix of the two)
 
 
 [19]
 The proposed consent decree tendered on August 3 did purport to find the present system contrary to the Fourteenth Amendment and the Voting Rights Act, and the motion filed with it stated that the "parties agreed" that the present system was unconstitutional and contrary to the Voting Rights Act, although no factual basis suggesting any such illegality is stated or appears of record
 However, a court is not bound to accept stipulations of law by parties to litigation. See, e.g., Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939); Avila v. Immigration & Naturalization Service, 731 F.2d 616, 620 (9th Cir.1984); Equitable Life Assurance Society of the United States v. MacGill, 551 F.2d 978, 983 (5th Cir.1977); Imperial Corp. of America v. Frenchman's Creek Corp., 453 F.2d 1338, 1346 n. 10 (5th Cir.1972); Sebold v. Sebold, 444 F.2d 864, 870 n. 8 (D.C.Cir.1971); Los Angeles Shipbuilding & Drydock Corp. v. United States, 289 F.2d 222, 231 (9th Cir.1961). And where stipulations may affect a number of cases beyond the one at bar, a court has a "duty to make its own resolution of such issues." Strauss v. United States, 516 F.2d 980, 982 (7th Cir.1975). In particular, stipulations "couched in conclusory terms are entitled to less deference than those couched in evidentiary terms." Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1369 (5th Cir.1983) (citing United States v. State of Texas, 680 F.2d 356, 370 (5th Cir.1982) ). This Court has previously criticized "trial by concession" as forming "a slender and dubious basis for ... sweeping measures [judicially] decreed," noting that, where a "state's ... legislative process is to be superseded ... by the order of a single judge, it must be upon the basis of firmer matter than appears in this record." State of Texas, 680 F.2d at 370.
 We also note that in a January 28, 1977 ruling, denying a temporary injunction against the present Austin city council election system, the United States District Court for the Western District of Texas, Austin Division, found, following an evidentiary hearing, inter alia:
 "Since 1971 a black has been elected to the city council under the at-large election scheme, and in 1975 a Mexican-American was elected to the city council. Thus, the present city council is composed racially of five whites, a black, and a Mexican-American. The evidence indicates that the present city council of Austin has been and, in all probability, will continue to be responsive to the particularized needs of black and Mexican-American residents of Austin. Substantial city resources are directed to areas of Austin in which black and Mexican-American residents comprise a significant proportion of the population. It also appears that blacks and Mexican-Americans in recent years have been afforded the opportunity to participate in the slating and electing of candidates that represent the interests of blacks and Mexican-Americans in Austin."
 "....
 "... the Court cannot conclude that Plaintiffs will be likely to show that the at-large election system in Austin affords blacks or Mexican-Americans less than equal opportunity to participate in the political processes involved in selecting members of the city council." (Hernandez, et al. v. Friedman, et al., No. A-76-CA 229; Overton, et al. v. Friedman, et al., No. A-76-CA 230.)